EWING *v.* McINTYRE.

1. WILLS—PROBATE—LOST WILLS—EVIDENCE—SUFFICIENCY.

In proceedings to probate a lost will, as in other civil cases, a preponderance of the evidence is all that is necessary to establish the will, there being no intermediate rule in this State as to the amount of proof required between that which obtains in civil and criminal cases.

2. SAME—EVIDENCE—ADMISSIBILITY.

In proceedings to probate a lost will, declarations of the testator are competent to rebut the presumption of revocation.

3. SAME—EVIDENCE—SUFFICIENCY.

On proceedings to probate an alleged lost will, evidence examined, and *held,* to require submission to the jury of the questions whether testator in fact made the will, and whether he destroyed it with an intent to revoke.

4. SAME—CONTENTS—SECONDARY EVIDENCE.

Where, on proceedings to probate an alleged lost will, there is testimony tending to show that the scrivener only made one will for testator, and that immediately after the will was executed a draft or memorandum of its contents, in the scrivener's handwriting, was found in the same room and near the same table at which the will was executed, which memorandum was in the same condition at the time of the trial as when the will was drawn, such memorandum is admissible in evidence.

Error to Wayne; Hosmer, J. Submitted June 15, 1905. (Docket No. 14.) Decided October 2, 1905.

Petition by Augusta Ewing for the probate of a lost will, alleged to be the last will and testament of Archibald P. McIntyre, deceased, to which Delos McIntyre and others filed objections. The petition was denied in the probate court, and proponent appealed to the circuit court. There was judgment at the circuit for contestants on a verdict directed by the court, and proponent brings error. Reversed.

*Maybury, Lucking, Emmons & Helfman (Harrison Geer,* of counsel), for appellant.

*Bowen, Douglas, Whiting & Murfin,* for appellees

BLAIR, J.   Archibald P. McIntyre died at his home in Sand Hill, Redford township, Wayne county, on the 13th day of May, 1900.   He left surviving him as his heirs at law two brothers, Franklin and Delos, who were residents of the State of New York, and a daughter of a deceased brother, Mrs. Helena Lamphere, who resided at Vassar, in this State.   No will being found after Mr. McIntyre's death, administration of his estate, amounting to $135,000 as appraised, was granted to one Bosworth, who administered and distributed the estate under the order of the probate court.   After the distribution of the estate, but before it was finally closed, the appellant, Augusta Ewing, filed her petition, which, as amended later on, alleged, among other things, the following:

"5. That, as your petitioner is informed and believes, the said Archibald P. McIntyre, during his lifetime, in conformity to law, duly executed in writing a certain paper, and, being of full age and in sound mind, did publish and declare the same to be his last will and testament.

"6. That the witnesses to the execution of said will were William A. Smith and Emma A. Yerkes.   That said witnesses were competent and duly attested said will in the presence of the testator and in the presence of each other. That the exact date of the execution of said will cannot now be stated, but your petitioner alleges, on her information and belief, that the same was executed and published as aforesaid between September 1st and October 31st, 1896.

"7. That the contents, terms, and provisions of said will, as your petitioner is informed and believes, were substantially as follows:

" I direct the payment of my just debts.

" I direct that my executor have my name and dates of my birth and death cut on my monument.

"I direct that my executor discharge the mortgage held by me against Carrie Hessey.

"I direct that my executor discharge the mortgage held by me against Calvin Parker and wife.

"I give to Almond Harris, of California, a nephew of my deceased wife, $5,000.

"I give to the grandchildren of my deceased sister in Wisconsin, $5,000.

"I give to Helen S. Lamphere, a daughter of my deceased brother Joseph, 100 acres of land off the east side of my farm and lying next to Thomas Burt's farm, south of the Grand River road.

"I give to Augusta Ewing, niece of my deceased wife, $5,000.

"I give to Emma Du Bois, niece of my deceased wife, that part of my farm in Redford, lying between Grand River road and the Waterford road, and east of the north and south road running on the west side of the hotel, including the store opposite said land facing on Grand River road, and also to her, $2,500.

"I give to Susan Stringer, niece of my deceased wife, the part of my farm lying west of said north and south road, and between Waterford road and Grand River road.

"I give to the person who has stayed with me and managed my household affairs and cared for me for at least two years, including the entire period of my last sickness, the hotel and contents thereof.

"I give to the two daughters of Eva Kenyon, formerly Eva D. Harris, the gold watch, jewelry, and wearing apparel of my deceased wife, and to the son of said Eva D. Kenyon [Archibald Kenyon] my gold watch, jewelry, and wearing apparel.

"I give all the residue of my real estate, personal and mixed, to the son and two daughters of Eva D. Kenyon herein mentioned, share and share alike.

"I nominate Wm. B. Ewing my executor.

[Signed]          "ARCHIBALD P. McINTYRE.

"And duly attested and subscribed as witnesses in the presence of the testator and of each other by William A. Smith and Emma A. Yerkes.

"7a. That after the execution of said will as aforesaid, as your petitioner is informed and verily believes, the same was placed by said testator in a certain private box kept by himself in a desk wherein were kept private papers, and to the time of his death the said will of the said testator was in existence and in full force and was never revoked by him, and by his demise became operative for the benefit of the persons heretofore recited as beneficiaries thereunder.

"7b. That your petitioner has caused a most careful and diligent search for said will to be made, and that said will cannot now be found.

"8. Your petitioner is informed and believes that the said Delos McIntyre and a nephew named Harold [son of

the said Franklin McIntyre], at the time of the death of deceased or immediately thereafter, took possession of and removed all of the private papers of the deceased, and after the funeral was over they hastily and unexpectedly departed to the State of New York, with the said papers in satchels and otherwise. And your petitioner charges the fact to be that they either destroyed the said will of deceased, which they found among his said papers, or have suppressed or concealed the same. That they have not returned the said papers [and other tangible property], and have not presented the said will for probate in the county of Wayne, but instead, on petition of said Helen Lamphere, proceeded with the administration of said estate in their own interest as the heirs at law of said deceased, wholly ignoring the rights of the said beneficiaries in the said will named.

"9. That Helen Lamphere, Herbert Babcock, Myrtie De Mund, and Nettie Coleman, who are named as beneficiaries under said will are respectively the same persons as the heirs at law above mentioned by said names.

"That the relationship, ages, and residences of the other beneficiaries under said will are as follows:

"Almond Harris, a nephew to the wife of said deceased, over the age of 21 years, and residing at Columbia, in the State of California.

"Susan Stringer, niece of deceased's wife, over 21 years of age, and residing in the city of Detroit, in said Wayne county.

"Emma Du Bois, niece of said wife, over 21 years of age, and residing in the city of Detroit.

"Alice Kenyon, over 21 years of age, and Bessie Kenyon and Archibald Kenyon, minor children of Eva D. Kenyon, deceased [who was a niece of said deceased wife], residing at Grand Ledge, in the State of Michigan.

"Your petitioner [Augusta Ewing], a niece of said deceased wife, over 21 years of age, and residing in Delray, as aforesaid.

"Therefore your petitioner prays that the said will of Archibald P. McIntyre, deceased, when produced or established as a lost or destroyed will, may be admitted to probate, and that the said estate may be distributed pursuant to the terms thereof."

Proponent's petition having been denied on hearing by the probate court, she appealed to the circuit court, where

a verdict was directed for the contestants, and she has appealed to this court.

The circuit judge held that there was sufficient evidence of the lawful execution of the alleged will to go to the jury, but directed a verdict for the reason stated by him, as follows :

" Now, gentlemen of the jury, I think the only further question there is in the case, and the matter on account of which I remove it from your consideration, is the question whether the legal presumption is, at the present time, that that will was revoked. I think, under the testimony in this case, the evidence shows that the will was revoked, and that there is not sufficient evidence introduced by the proponent which has a legitimate tendency to show that this will was still in existence at the time of the decease of the testator. The only testimony which I may say squints in that direction, and I don't believe it amounts to a scintilla, is the evidence of Mrs. Yerkes, and the only evidence of Mrs. Yerkes is the evidence that Harold McIntyre, who was one of the blood relatives, took a certain pocketbook and took from there money, which he concealed in the barn. There is no evidence on her part or on the part of anybody else that he took a will, or that there was a will in existence at the time of the old gentleman's decease. There is some testimony, I think, of declarations not long before his death—if I recall it, the last declaration was in December—that he had made provisions for certain persons; but I do not think that that evidence is sufficient to overcome the presumption of the law of the revocation of the will which had been excluded. The rule of the law, as I understand it, in the absence of testimony which would tend to show a suppression of the will, or tend to show the loss of the will, is that when such will is not found that there is a revocation, and when, as in the case at bar, the property is devised, the revocation would result in leaving the property to those who are of his own blood, it seems to me, gentlemen, that the presumption of revocation must be even stronger.

" Now, for these reasons, gentlemen, I feel constrained to remove this from your considerations, and direct a verdict as against the proponent."

Counsel for appellee submit that the court was in error

in holding that there was any evidence legitimately tending to establish the execution or contents of the alleged lost or destroyed will, and that in such cases only the clearest and most stringent evidence suffices. We think the trial judge was clearly correct in his holding in this regard. There is no intermediate rule in Michigan as to the amount of proof required between that which obtains in civil and in criminal cases. In testamentary as well as in other civil cases, a preponderance of evidence is all that is required to sustain the issue. *Aikin* v. *Weckerly*, 19 Mich. 482.

The sole question, therefore, under the charge, is whether there was any evidence in the case legitimately tending to overcome the prima facie presumption of revocation arising from the nonproduction of the will. In determining this question, we must give to the testimony the most favorable interpretation and the greatest probative force that it will legitimately bear in support of the proponent's case. Moreover, the testator's papers, including the will, if there was one, fell under the control of the contestants, who had a powerful motive for suppressing it.

" This is a consideration which could not be overlooked in a discussion turning on the influence of presumptions. *Schultz* v. *Schultz*, 35 N. Y. 653. The presence of motive and opportunity could not be wholly disregarded." *Stevens* v. *Hope*, 52 Mich. 65.

Considering the testimony in the light of these rules, the jury would have been warranted in finding:

1. That the testator, in the full possession of his mental faculties, made his will in September, 1896, whereby he intended to and did dispose of all of his property, giving nothing to his two brothers.

2. That he entertained a kindly feeling for all of the devisees, most of whom are relatives by affiliation or blood, and a deep affection for the residuary legatees.

3. That he entertained a feeling of bitter hostility towards his two brothers in New York, and died without material change of sentiment in this regard.

Mrs. Yerkes testified that before and after the making of the will she heard the testator say of his brothers:

"He never got a dollar from them and they never would get anything of his. * * * I heard him say it a number of times."

Mr. Lee testified that testator said to him:

"So far as his brothers was concerned, they never would help him when he called upon them, and he would be damned if they should ever have a dollar's worth of his property if he could help it."

Kate Du Bois testified that she heard him say in the summer of 1899:

"My people shall never have any of my money when I am gone."

Joseph McEcheran testified:

" From conversation that I have had with Mr. McIntyre, I know that he felt very hard towards his brothers (Franklin and Delos). * * * I have heard Mr. McIntyre say that when he disposed of his property that his brothers should not have any of it. * * * I could not say how many times I have heard him make this statement. I have heard him make it a good many times while I was there."

Abram Shepherd testified:

"I heard him say there was a time when he wanted some help; that his brothers might as well have helped him as not; they were in condition so they could; they would not do it, but he had got so that he did not need any help; now they were willing to be neighborly and friendly with him, or about to that effect—that was the meaning of it—but now he did not want anything to do with them. I have heard him say that he did not calculate that his brothers would have any of his property. He said this a number of times. I could not say how many times; but at different times we would talk about this thing and that thing, and about our relations and so on, and that seemed to be his mind. He seemed to be quite bitter against his brothers for the way they had used him before."

And that in the fall of 1899:

"On that occasion the conversation came up in something, I forget just how now, about relatives, and so on, and he said in substance that he had fixed it or would fix it so that his brothers would have nothing of his property. I could not say which he said, but in that way it was that his brothers would not get any of his property. That is the meaning of it.   *   *   *   He said he did not want his brothers to have it, a number of times before that, along in 1885, '86, and '87."

Dr. Holcomb testified:

"The only words I ever heard from Mr. McIntyre about his folks was his feelings against his brothers. I have heard him speak in favor of a great many different people, but I never heard him say anything in favor of any of his relatives.   *   *   *   I know Harold McIntyre. I remember of his coming there some time during his last illness. I think he came about a week before Mr. McIntyre died. I don't just remember. He was there several days. I believe Mr. Bosworth wrote him a letter. Before Bosworth notified Harold to come, I had a conversation with Mr. McIntyre about sending for any one. I asked him if we hadn't better telegraph or send his brother word about his sickness, and he said, 'No.' That was before Harold came.   *   *   *   There was something said about Delos, and Harold said, why, something about, if Mr. A. P. McIntyre got better and he knew he sent for Delos, he would not like it, something to that effect; and he asked me to ask for Franklin McIntyre, and Mr. A. P. McIntyre first said, 'No,' and then he said, 'Well, the boy is here and we will see about that,' or 'will look after that'—something to that effect. The express language I cannot remember. At the time I asked him if I should telegraph for his brother, I informed him of the fact that he was a very sick man."

4. That he recognized the will as still in existence as late as December, 1899.

He told Mr. Lee:

"That he had enough to take care of Eva or her children *and that he had already provided for Eva's children.*   *   *   *   That talk was the last time that I saw him; I think the 28th day of December, before he died in the spring."

Mr. Rogers testified that he had a conversation with him in the fall of 1899:

"He says: 'Charlie, I don't know whether I will pull through to spring or not.' I remarked to him: 'Why, Mack,' referring to him (McIntyre). We always called him 'Mack.' I says: 'Why, Mack, I guess you will pull through. You are a pretty strong, rugged man yet.' 'Well,' he says, 'I don't know. I am feeling pretty bad.' I said he hadn't ought to work. I said: 'I suppose you have got your business all arranged satisfactorily to you.' 'Why, yes,' he says, 'I have got that all fixed up; got the will made and everything fixed up.'"

Mr. Wright had a conversation with him in March, 1900.

"He asked me if I knew whether Mr. Perry had made a will, and I told him that I did not, but I did not think that he had a great deal to will; that his stuff was mostly all mortgaged. 'Well,' he says, 'that is too bad,' he says, 'when a man gets to Perry's age and mine,' he says, 'they ought to have their property fixed so that they would know where it was going to.' He says: 'I have got mine fixed that I know who is going to get it, so there won't be any quarreling, and I thought Perry had his.'"

Mr. McEcheran had a conversation with him, in which he mentioned the death of Mrs. Kenyon, the mother of the residuary legatees:

"And he took her death very hard. That was after she died. He felt very bad about it. And he said at that time that he had provided for her children by will. That was in the spring of 1897. * * * When I said Mr. Smith told me he had already made a will, Mr. McIntyre said he had. He said he thought he had better have it done while he was in shape to do it, and he said he had provided for these Kenyon children in that will; and he said at that time Bill Ewings—William Ewings—was to be executor of the will."

5. That Harold McIntyre, a son of Franklin, and Delos McIntyre, a brother of Franklin, had an opportunity to and a motive for suppressing the proposed will, if it existed.

Mr. McIntyre died about 6 o'clock Sunday evening, May 13, 1900. A week previous, Harold McIntyre had come from New York in response to a letter from Bosworth. During this last week he and Mrs. Yerkes were the only persons who were about the hotel. Until Friday, Harold worked in the barn; but on Thursday Mr. McIntyre grew worse, and from that time on Harold spent his time in the hotel. On Friday McIntyre grew worse, and in the evening it was decided to operate on him. This was performed on Saturday. For two or three days he was in a semi-comatose condition. After the operation he never regained consciousness, and died Sunday night. In preparing him for the operation on Saturday morning, Dr. Holcomb found a pocketbook in the sleeve of McIntyre's shirt, containing $1,000 in money, some checks, and some keys. The doctor and Harold went upstairs and counted the money, and then Harold took possession of the pocketbook and all its contents. At this time McIntyre was in a comatose condition, and unable to appreciate what was going on. These keys opened the desk and tin box in which McIntyre kept his papers. From this time until 8 p. m. Sunday night these keys were in Harold's possession. During this time Harold was continuously in and out of the room where McIntyre lay. He slept on a couch by the door, and had free and complete access to this desk at all times. About noon Sunday, while McIntyre was unconscious, Harold removed from the desk $600 in cash and secreted it in the barn, saying it was "damn right his." A short time after McIntyre's death Harold approached Dr. Holcomb and said that there was money there which some one ought to look after, and asked him to assist in the search. Bosworth, Willmarth, Harold, and the doctor together went to the secretary or desk. Dr. Holcomb called for the key. Harold handed it to him, taking it from his pants pocket. The doctor opened the desk, and examined the contents to see what money could be found. A large amount of papers of various kinds were found, among them some notes,

and mortgages. The notes and mortgages, together with the money, were placed in the safe in Bosworth's store across the street. The majority of the papers were not examined at all. No search was made for a will. They were looking for money. Immediately after the funeral on Wednesday, Harold hurriedly took all the papers out of the drawers, pigeon holes, etc., in the desk, stuffed them in pillow cases, and placed them in a telescope. Together with his Uncle Delos, he left for New York State that night, taking the telescope and papers with them, where they remained until Thursday or Friday of the following week. Harold McIntyre testifies:

" Uncle and I left Sand Hill about 7 o'clock that night; I think 7 or 8 o'clock. I carried this grip full of papers. I did not take with me any of the papers which had been placed in Mr. Bosworth's safe and afterwards placed in the Wayne County deposit box. *I had the key to that deposit box.* I traveled with my uncle to Evanston, N. Y., and his home was four miles below there, and I left him at Leonardsville. *My uncle had the telescope with these old papers.*"

Dr. Holcomb testified that the bills in the long pocket-book in the desk—

"Looked as though they had been handled in some way. They were not out smooth. They were crinkled up apparently. That was easy to be discerned. Looked as though they had been handled by somebody, and after they were straightened out they were put back in the pocketbook."

If the declarations of the testator were admissible as evidence, then we think the case should have been submitted to the jury. Here was a very large estate, in the eyes of the parties interested, and the desire to possess it would furnish a powerful motive for suppressing a will which would divert it entirely into other channels. Both immediately before and after the death of Mr. McIntyre, his papers came into the hands and were under the control of those who had this powerful motive, and, without having made any specific search for a will, they immediately after

the funeral removed the vast majority of the papers from the State of Michigan and left them in charge of the brother whom Harold was afraid to send for. The secreting of the testator's money by Harold was also a suspicious circumstance, which the jury were entitled to consider in determining whether he would be likely to take advantage of his opportunities to secrete a will, if one existed. The inveterate hostility of the testator towards his brothers, which was in large part the cause of his making the will, in order that they might get none of his property, might also give rise to ·a legitimate inference that the brothers, whose motive would lead them to destroy the will, actually did destroy it, rather than the man whose motive would lead him to preserve it.

But counsel for contestants contend that the declarations of the testator were not competent evidence to rebut the presumption of revocation, and that the great weight of current authority is to that effect, citing *Throckmorton* v. *Holt,* 180 U. S. 552; *In re Kennedy,* 167 N. Y. 163; *Clark* v. *Turner,* 50 Neb. 290 (38 L. R. A. 433); *Mercer's Adm'r* v. *Mackin,* 14 Bush (Ky.), 434; *Lane* v. *Moore,* 151 Mass. 87; *Meeker* v. *Boylan,* 28 N. J. Law, 274; *Walton* v. *Kendrick,* 122 Mo. 504 (25 L. R. A. 701); *Hayes* v. *West,* 37 Ind. 21; *Couch* v. *Eastham,* 27 W. Va. 796; *Gordon's Case,* 50 N. J. Eq. 397; *Leslie* v. *McMurtry,* 60 Ark. 301; *Gibson* v. *Gibson,* 24 Mo. 227.

We do not deem it necessary to enter upon a discussion of the authorities, to determine on which side the weight of authority lies, since the rule has been established in this State against contestants' contention. *Lawyer* v. *Smith,* 8 Mich. 412; *Harring* v. *Allen,* 25 Mich. 505; *In re Hope,* 48 Mich. 518; *In re Lambie's Estate,* 97 Mich. 50; *Cheever* v. *North,* 106 Mich. 390 (37 L. R. A. 561).

The *Throckmorton* and *Kennedy Cases,* supra, repudiate the doctrine of *Sugden* v. *Lord St. Leonards,* L. R. 1 Prob. Div. 154. That case is cited with approval in the *Lambie Case,* supra, by this court. See, also, in

support of the rule as adopted in Michigan, *Patten* v. *Poulton*, 1 Swab. & Trist. 55; *Morris* v. *Swaney*, 7 Heisk. (Tenn.) 591; *Southworth* v. *Adams*, 11 Biss. (U. S.) 267; *Gardner* v. *Gardner*, 177 Pa. 218; *Gavitt* v. *Moulton*, 119 Wis. 35; *In re Page*, 118 Ill. 576; *McDonald* v. *McDonald*, 142 Ind. 55.

As said by Chief Justice Appleton in *Collagan* v.*Burns*, 57 Me. 449:

" The declarations of the testator may have been false and uttered to deceive; or, being true, they may have been misunderstood, in whole or in part, from inattention. They may have been misrecollected from forgetfulness or misreported from design. But all this affects the degree of credit to be given the testimony, not its admissibility. It shows that caution should be used in weighing it, not that it should be excluded. The exclusion of evidence, relevant and material, from the fear that it may not receive its just degree of credence, is the rude resort of barbarism. Civilization hears, weighs, examines, compares, and then decides."

But one other question remains for consideration: The trial judge excluded a certain paper alleged to be the original draft of the alleged will, and upon this ruling error is assigned. It was proved by the testimony of two of the scrivener's sons that the draft or memorandum was undoubtedly in their father's handwriting. The draft agrees in most respects with the oral testimony as to the contents of the will and the expressed intentions of the testator. There was evidence from which the jury might legitimately find that Mr. Smith, the scrivener, read the will over to testator and it was then executed by the testator and witnesses, without change; that in the evening of the same day the draft was found upon the floor of the same room and near the same table at which the will was executed; and that the draft was in the same condition as then. If this paper actually was the draft from which the will was drawn, and the will had been destroyed, the draft was manifestly the best evidence in existence of its contents. The testimony indicates that this was the only will which

Mr. Smith had ever prepared for Mr. McIntyre, and we think the question should have been submitted to the jury whether the paper was the preliminary draft from which the will was drawn. If it was, it was admissible in evidence.

The judgment is reversed, and a new trial granted.

CARPENTER, GRANT, MONTGOMERY, and OSTRANDER, JJ., concurred.