## *In re* STOCKDALE'S ESTATE.

### APPEAL OF THE CITY OF FLINT.

1. JUDGMENTS—RES ADJUDICATA—PROBATE OF WILLS—STIPULA-
TIONS FOR JUDGMENT.
  A judgment of the circuit court, on appeal by a legatee from
  probate court, admitting a will to probate in pursuance of a
  stipulation between contesting beneficiaries, is not conclusive
  of the fact that a subsequent will, which, pending such ap-
  peal, the proponent had petitioned the probate court to allow,
  was not the last will of the deceased.

2. APPEAL AND ERROR—REVERSAL.
  A case should not be reversed in favor of a party thereto, who
  is not, in any view of the evidence, entitled to a judgment.

3. TRIAL — CROSS-EXAMINATION — IMPEACHMENT — CONDUCT OF
JUDGE.
  It is prejudicial error for a trial court, in examining a witness,
  to adopt the manner of a hostile cross-examiner, and to so
  frame questions as to indicate his opinion that the witness is
  not testifying truthfully.

4. WILLS—BURDEN OF PROOF—PROVING LOST INSTRUMENTS—IN-
STRUCTIONS.
  An instruction to the jury, in substance, that the proponent of
  a lost will must maintain the issue by a clear and unquestion-
  able preponderance of the evidence, requires too high a degree
  of proof.

Error to Genesee; Wisner, J.    Submitted February 16,
1909.   (Docket No. 12.)   Decided July 15, 1909.

Petition by the city of Flint for the probate of an
alleged lost will of Mary Stockdale, deceased.   The will
was disallowed in the probate court, and proponent ap-
pealed to the circuit court.   A judgment for contestants
is reviewed by proponent on writ of error.   Reversed.

157 MICH.—38.

*De Vere Hall* (*Homer J. McBride* and *Harrison Geer*, of counsel), for appellant.

*John J. Carton, Mark W. Stevens, Brennan & Cook, Brown & Farley,* and *Black & Roberts,* for appellees.

Blair, C. J. The writ of error in this case is prosecuted to set aside the judgment entered upon the verdict of the jury therein, finding that the said Mary Stockdale did not execute a certain alleged will propounded by proponent as a lost will. Mrs. Stockdale died on April 26, 1905, at her home on her farm just outside the city limits of Flint, and the only will found after her decease was a will drawn by William Stevenson, and properly executed by her on the 10th day of September, 1883. This will appointed William Stevenson and Charles T. Bridgman executors; was filed for probate on April 29, 1905; contested by the heirs at law; and was decreed by the probate court not to be the last will and testament of Mrs. Stockdale, for the reason that she had revoked it by another will containing a revocation clause. From the decree disallowing the will Charles T. Bridgman, as executor, and the Harper Hospital of Detroit, as a legatee, appealed to the circuit court.

On the 11th day of December, 1906, in pursuance of a stipulation to that effect, entered into by Brown & Farley and Black & Roberts, attorneys for the heirs at law, Carton & Bray, attorneys for the legatees, and Brennan & Cook, attorneys for Charles T. Bridgman, appellant, an order was entered in the circuit court dismissing the appeal of said Bridgman. On the 5th day of April, 1906, an agreement was entered into between the legatees and heirs at law settling the estate on the basis of 40 per cent. to the legatees and 60 per cent. to the heirs at law, and authorizing their respective attorneys—

"To take such steps and proceedings as may be necessary, and which in their judgment may be expedient, either to admit said will to probate, or to disallow the

same, so that administration of said estate may be had, and said estate distributed and settled either as a testate or as an intestate estate."

On the 10th day of December, 1906, judgment was entered in the circuit court in the Harper Hospital appeal upon a directed verdict, adjudging the will of September 10, 1883, to be the last will and testament of said Mary Stockdale, and remitting the cause for further action to the probate court. On February 19, 1906, David D. Aitken, as mayor, filed his petition in behalf of the city of Flint, for the probate of the alleged lost will in issue in this cause. The petition was denied by the probate court, and appeal taken to the circuit court, where the appeal was dismissed. The petitioner thereupon applied to this court for a writ of mandamus to require the circuit judge to vacate his order dismissing the appeal. The writ of mandamus was denied by this court, November 24, 1906, upon the ground that the appropriate remedy was by writ of error. *City of Flint* v. *Genesee Circuit Judge*, 146 Mich. 439 (109 N. W. 769). The record having been brought before this court for review upon writ of error, the order dismissing the appeal was vacated, the appeal reinstated, and the cause remanded for further proceedings. *City of Flint* v. *Stockdale's Estate*, 149 Mich. 214 (112 N. W. 710).

On the 10th day of December, 1906, notice of issuance of a writ of error and a copy of assignments of error were served upon contestants' attorneys. In the brief for contestants it was set up that the pendency of the appeal of the Harper Hospital and the judgment entered therein were conclusive of proponent's rights. On January 26, 1907, an order to show cause why proceedings in the Harper Hospital appeal, both in the probate and circuit courts, should not be stayed was entered, and on the 18th day of March, 1907, an order was entered staying all proceedings until the further order of this court, except as to matters necessary to conserve and protect the estate. On the 26th day of December, 1906, contestants moved to

dismiss the writ of error issued on December 10th, for the reason, among others:

"*First*. That the status of the estate of the testatrix and its testacy having been fully adjudicated and established by the verdict and judgment of the circuit court for the county of Genesee, and said judgment being final and binding upon the petitioner and appellant in this cause, said writ of error was improvidently issued, and the proceedings had thereunder of no force, and said writ should be recalled and dismissed."

The principal witness for proponent was Howard O. Taylor, who testified that he drew a will for Mrs. Stockdale on November 12, 1898, at the probate office in the city of Flint, he being at the time probate register, and his father, George E. Taylor, judge of probate for Genesee county; that Mrs. Stockdale executed the will in the presence of himself and father, and they signed it in her presence as witnesses, whereupon he placed the will in a blue envelope, wrote upon it, "Last will and testament of Mary Stockdale," and delivered it to her. He also testified to the contents of the will, in part, and that his recollection was that it was drawn upon a certain blank form which he had had prepared, and which was put in evidence. This blank contained figures showing it was printed in September, 1899. He had testified in probate court that the blank used was a duplicate of the blank put in evidence. Later on, being recalled, he testified:

"*Q*. Do you know whether these blanks you first acquired, such as Exhibit A, were republished during the years that you were in office?

"*A*. Several times.

"*Q*. Who published them for you?

"*A*. Well, different ones, depending on who to be ordering goods from.

"*Q*. Do you know what these figures ' 9–99 ' means on the top of the Exhibit *A* ?

"*A*. Yes.

"*Q*. What is it?

"*A*. That means the date the blank was printed.

"*Q*. Had you used this form prior to that time?

"*A.* I should judge about five years before that, four or five."

Mr. Taylor testified on the trial in the circuit court, concerning the blank form used, as follows:

"*Q.* What did you use in the draughting of this will, a blank paper written entirely by you, or a blank filled by you?

"*A.* My memory is it was a blank filled by me.

"*Q.* Did you have and keep blanks for that purpose in your office?

"*A.* Yes, sir.

"*Q.* I show you a blank form, and ask you how the form which you employed agreed with the form which I show you?

"*A.* My memory is I used that form, but I would not swear to that positively.

"*Q.* Did you have more than one blank form around?

"*A.* I could not swear to that.

"*Q.* The blank form which you used, where did you procure it?

"*A.* It was naturally laying around on some of the desks there.

"*Q.* I mean who constructed it?

"*A.* The one I usually used I constructed myself; had it printed.

"*Q.* What have you to say as to whether your best recollection is that the will, the form which I show you, is the form employed by you in draughting the will?

"*A.* I would not say anything more definitely, Mr. Hall, than I have already said on that subject.

"*Q.* Just repeat it again, please.

"*A.* I said my impression is I used that form.    *    *    *

"*Q.* You stated, I think, Mr. Taylor, that Exhibit 3 is the form of will which you draughted for Mrs. Stockdale, November, 1898?

"*A.* No, I didn't make any such statement. I said I thought it was.

"*Q.* Well, that is your best judgment?

"*A.* That is my best impression it was. It might have been a blank form that was lying around the office there.

"*Q.* I mean so far as the material and substantial parts of a will are concerned, whether the one which you made differed materially from Exhibit 3?

"*A.* No; it did not differ materially.   Very probably that is the form.   *   *   *

"*Q.* Is it your recollection that the earlier blanks were the same as this?

"*A.* That is, no special recollection, a comparison of two blanks of different issues would show what that means.   I haven't any recollection of that.

"*Q.* Have you any recollection of material change in the blank?

"*A.* No recollection at all as to the fact.   All I have any knowledge that any issue has the time it is printed on it.

"*Q.* I do not mean as to the change in this; I mean as to the substantial part of the blank?

"*A.* No, sir.

"*Q.* I will ask you, Mr. Taylor, if you can remember of drawing any will upon any blank other than the blank marked '9-99'?

"*A.* I would not answer that question either yes or no, because I testified here before.   It might possibly have been on a sample blank that was in the office.

"*Q.* Will you swear that you ever did draw any will upon any blank other than blank 9-99 prior to September —prior to Mrs. Stockdale's death?

"*A. Yes, sir; I will swear that I have, several.*

"*Q.* Now, did you ever draw—will you swear that you have ever used a blank in drawing a will prior to the time of getting the blank marked '9-99'?

"*A.* Yes, sir; several.

"*Q.* Can you give me the names of any of them?

"*A. If I could, you haven't any right to ask that.*

"*Q. You can, but you would not?*

"*A. I don't say that; but, if I could remember—I don't pretend to say I can remember what kind of an individual blank I used for every paper I drew.*

"*Q.* Then you had been using blanks for several years prior to September, 1899?

"*A.* That is my recollection.

"*Q.* How many?

"*A.* I would not undertake to state, Mr. Hall, a matter of recollection; I couldn't swear to the number.

"*Q.* Now, in your former testimony, you stated that you had used them for a period of four or five years prior to 1899?

"*A.* In that language?

"*Q.* The substance of that.

"*A.* I will say probably that is true now, *but I would not swear the exact number of years.*

"*Q.* You also stated on your former examination, as I remember from reading it, that you had this blank marked '9–99' republished several times?

"*A.* Yes, sir.

"*Q.* You are sure about that?

"*A. I can state the circumstances if I have got to, but I would rather not.*

"*Q.* How many did you have published each time?

"*A.* That would depend on the generosity of the traveling men that happened to take the order.

"*Q.* As a rule, how many?

"*A.* Probably from two to four quires.     *     *     *

"*Q.* During what period of time was you using those quires?

"*A.* There you are, going back where I wouldn't undertake to swear again.

"*Q.* Was it during that period of four or five years you mention?

"*A.* Yes, sir.

"*Q. Those blanks were used in all wills that you drew?*

"*A.* No; I will not undertake to say that.

"*Q.* Well, it was your custom to use blanks?

"*A.* Usually that was true that is all I could think to use them for, probably I used them."

Another witness, Betsey Lincoln, testified to taking the will out of the blue envelope and reading it, in the spring of 1902, and that it disposed of property as follows:

"Morey Andrews, city of Flint, $50,000; Louisa A. Dinturff, Syracuse, New York, her niece, $1,000; Carrie Campbell, city of Flint, $1,000; Walter White, home farm, west side of the road, and all the rest of the real estate, personal was to be left to the city of Flint, for a hospital to be known and called the 'Hartshorn Hospital.'"

Dr. Sarah Allen also testified to seeing the blue envelope, and that Mrs. Stockdale told her, in effect, that it contained a will drawn by Howard Taylor, and that she had submitted it to his father, Judge Taylor, and it would "stand law." There was other testimony tending to show the presence of the blue envelope in Mrs. Stockdale's safe

down to within a few weeks of her death, and that it could not be found after her death. Mr. Rundell, one of the special administrators, testified that the day following Mrs. Stockdale's death Mrs. Dinturff, one of the heirs at law, came to his office, and said, "This is an awful thing, isn't it, this will leaving this property away from us," and offered him $25,000 if he would make a will, and she would look after it; that she could "write enough like Aunt Mary [Mrs. Stockdale] so that no one could tell the difference." She also said that she could get witnesses. He said to her that she might find the will "when we come to examine her papers." She said, "I know you won't." She had the keys of the safe at that time, and delivered them to him the next day at the Stockdale house, and he had had them ever since. After the 1st of April, 1905, he went to the safe in Mrs. Stockdale's house, and Mrs. Holton, a niece of Mrs. Stockdale, got the keys to open the safe. She said that she expected "she would have to look after the keys from now." He saw a blue envelope there at that time. Mrs. Dinturff came to Mrs. Stockdale's home two weeks before her death and remained there till some time afterwards. She learned of the 1883 will the day of her aunt's death.

Samuel Evans testified that on the Sunday following Mrs. Stockdale's death Mrs. Dinturff called him into the sitting room, and wanted to know if he could not recall signing a will, saying,

"If you could remember of signing a will that was witnessed by somebody else that Mr. Andrews had drawn, there would be $10,000 in it for you, and it would be easier than working for it."

He suggested calling Mr. White in. She said it was no use because "he has told Mrs. Stockdale had no will." On May 11th Mrs. Dinturff wrote and mailed the following unsigned letter addressed to Mr. Evans:

"Friends Mr. and Mrs. Evans: I have to leave here today—had hoped to see you again, but if the paper you saw was not the one we were looking for, of course it is

no use. This is a hard thing to come on us. Say nothing to anyone of what I said and talked to you both—for there is lots of talk, and we don't know what next, so better keep out of it altogether. I trust you as a friend. Good-by—shall come again."

Mrs. Dinturff denied absolutely the conversation with Mr. Rundell, or that she was at his office, or had the keys as he stated. She also denied offering any money to Mr. Evans, though she admitted talking with him on the subject of whether he had signed any will, and admitted writing the anonymous letter.

At the close of the voluminous testimony, which is in irreconcilable conflict on nearly every material point, the contestants moved the court to instruct a verdict in their favor, which was denied, and the case went to the jury, who found a verdict against the alleged will.

Contestants' counsel insist in this court, as they did in the circuit court, that a verdict should have been directed in their favor for the reasons:

" (1) There was no evidence to go to the jury that the alleged will of November 12, 1898, had been destroyed by anybody other than Mrs. Stockdale during the lifetime of Mrs. Stockdale, or had been destroyed or suppressed by anybody after her death.

" (2) Because the witnesses sworn by the proponent to prove the contents of the will differ materially, and even dispute each other as to what those contents were.

" (3) That judgment having been rendered in the circuit court for the county of Genesee on December 10, 1906, sustaining the will of September 10, 1883, and admitting it to probate as the last will and testament of Mary Stockdale, deceased, that judgment determined the status of the estate of Mary Stockdale, deceased, and became final and conclusive upon all persons interested in said estate, so long as the same stood unreversed."

It is true that a case should not be reversed for errors committed against a party who, it is apparent, is not entitled to succeed in any event, and where, upon the whole record, he has not made out a case. 3 Cyc. p. 385, and notes; *Barnum* v. *Stone*, 27 Mich. 332; *Richards* v.

*Tozer*, 27 Mich. 451; *Bewick* v. *Fletcher*, 41 Mich. 625 (3 N. W. 162, 32 Am. Rep. 170); *Louden* v. *City of East Saginaw*, 41 Mich. 18 (2 N. W. 182). An examination of the record in this case, however, has satisfied us that the circuit court did not err in submitting the questions of fact to the jury as to the destruction of the will and its contents, and that, under the decision of this court reinstating the appeal and the order staying proceedings, the judgment of December 10, 1906, which in reality was a mere ratification of the agreement of the parties, was not conclusive upon proponent, whose proceedings to probate the alleged lost will the contestants were actively combating at the time. As we have reached the conclusion that errors were committed for which the case must be reversed, we shall only discuss the assignments relating to such errors.

Prejudicial conduct of trial judge. At the request of the court, Mr. Taylor was recalled, and examined by the court, as follows:

"*Q*. I understood you to say, some time during your examination here in this case, that you had had published a number of orders of blank wills?

"*A*. Why, that would be my memory, your honor.

"*Q*. Previous to 1899?

"*A*. That would be my memory; yes, sir.

"*Q*. And I think you stated that those orders consisted from two to four or five quires in accordance as to whether the agent might be liberal or otherwise—is that the substance of the testimony?

"*A*. No; I did not say five. It might be two or four.

"*Q*. Two or four quires?

"*A*. I should say so.

"*Q*. That is 48 or double—

"*A*. Or 96, or three quires.

"*Q*. And when you got out of blanks, you gave another order and have some more printed?

"*A*. Why, that would be my memory.

"*Q*. Well, now in the interest of justice, I want you to tell me the name of a single person for whom you drew a will on a blank previous to September, 1899?

"*A*. Well, I can't tell anything about those things; I don't remember.

"*Q.* You don't, out of all those, out of all those blanks, you cannot give a single name of a person for whom you drew a will?

"*A.* Not at present, I am not able to. I may be able to find one.

"*Q.* Well, now, this case is liable to last four or five days yet. I want you to investigate, and be able to tell this jury and this court if you can, the name of a solitary individual for whom you drew a will on a blank previous to 1899 ?

"*A.* Yes, sir.

" *The Court:* That is all at the present time.

"*A.* I want to make a statement that I don't swear that I drew this will on this blank. I don't remember that.

" *The Court:* Well, the testimony is here; that is for the jury.

" *The Court:* That is all.

" *Mr. Hall:* I will take an exception to the examination of this witness by the court.

" *The Court:* That is all."

Later in the trial the following occurred:

" *The Court: You have got Mr. Taylor here today, have you, Mr. Hall ?*

" *Mr. Hall: I suppose he is here.*

" *The Court: Well, you remember I examined him, and I want to examine him again before this case closes.*

"*Mr. Hall:* I want to take an exception to the attitude and statement of the court in regard to Mr. Taylor. He is a subscribing witness to this will, called by necessity.

"*The Court:* The court wishes to place on the record that here is the most important case that was ever tried in Genesee county, and I want this jury to have every last bit of evidence that can be produced, and I want myself to know every last bit of evidence that can be produced, that this jury may be enabled to determine who is telling the truth among the witnesses in this case, and that they may be able to arrive at a verdict which shall be just and right between the parties. That is the only desire this court has.

"*Mr. Hall:* Yes, I appreciate that, and I accept it, if it is a criticism on me, the suggestion of the court; but it has been directed unfortunately to our witness.

"*The Court:* Well, the record will disclose what has occurred, and further why the court has seen fit to examine the witness himself. It is not a question of fortune or misfortune. It is a question of justice.

"*Mr. Hall:* Note an exception to the statements of the court."

At the close of the testimony Mr. Taylor was recalled at the instance of the court, and the following occurred:

"*By the Court:*

"*Q.* Since you were here the other day, Mr. Taylor, have you been able to recall the name of any person for whom you drew a will upon this blank?

"*A.* No, sir."

Publishers of legal blanks and their representatives were called with reference to this particular blank to show that it had not been published prior to September 9, 1899, nor had one like it been published prior to that time. Their testimony also tended to show that they had printed no special will blanks for Judge Taylor or his son prior to that time. There was also evidence that the orders for blanks for each month were placed in an envelope, and the envelopes for the year filed in books, and that the envelopes of the year 1899, which would have shown exactly what Mr. Taylor's order was, were lost.

In the course of his argument to the jury, Mr. Farley, one of the attorneys for the heirs at law, said:

"Of course Howard Taylor may have drawn a will for Mrs. Stockdale, but I don't believe he knows what was in it, and I don't know as Mrs. Stockdale ever signed it. My theory of that matter is that Howard Taylor probably drew a will at the instance of Morey Andrews, and that Morey Andrews took that document up to Mrs. Stockdale and submitted it to her, and she was considering the question of whether she should sign it, because you remember Howard says that Morey went to the office with Mrs. Stockdale and came after her. Now, if Morey knew that she was drawing her will, he would not have told Mr. Evans that Mrs. Stockdale had not made a will. He would not have told Mr. Evans that she was considering a paper that she might want him to sign as a witness.

Now, that is my theory of the case.   *   *   *   Now, it is true, as Mr. Hall will say to you, that this evidence of Mr. Taylor was evidence upon which we believed to some extent, when we started in with this contest against this will of 1883, but since I have heard the testimony in this case, gentlemen, since I have heard the gentlemen from Detroit and Kalamazoo come up here, and say that Mr. Taylor, when he drew a will upon a blank of that kind, I thank my lucky stars that we made that settlement with those institutions down there in Detroit and Buffalo, because I should feel very shaky for the clients that I represent if we hadn't done it."

The jury reported the following verdict:

"We find that Howard Taylor never drew a will for Mrs. Stockdale, and such a will never ought to be probated, and the Stevenson will is the only legal will she ever drew."

The form of the questions put by the circuit judge being that of a hostile cross-examiner; the singling out of Mr. Taylor and recalling him after his examination and cross-examination, by opposing counsel, had been finished and other witnesses had testified; the reference to the interests of justice and the importance of the case—all tended to indicate to the jury the opinion of the circuit judge that the testimony as to the blank was of the greatest importance; that if the witness were testifying to the truth, he would be able to name some person for whom he had drawn a will on a blank previous to 1899; and that unless he could remember some other will for which he used a blank, his testimony should be discredited. An intelligent juryman could hardly have failed to believe that the judge regarded the failure of Mr. Taylor to name a single person for whom he drew a will upon a form previous to September, 1899, as a serious impeachment of his testimony. The course of the circuit judge also tended to unduly emphasize this question. Whether Mr. Taylor drew the will was the principal question, and his failure, after the lapse of eight or nine years, to be able to name a person for whom he had drawn a will upon a

blank, was only material as it affected his credibility.
Aside from his testimony as to the blanks, at least, Mr.
Taylor appears to have been a fair and impartial witness.
He testified to the most damaging facts in the case
against the proponent. He also squarely contradicted
Mrs. Lincoln, the principal witness as to the contents
of the will, as to the devise of the home farm to
White, and contradicted other witnesses for proponent.
He was able to recollect very little of the contents
of the will, and, apart from his testimony that he drew
the will, his testimony was favorable to the contestants.
Mr. Taylor was first called as a witness by Messrs. Black
& Roberts and Brown & Farley, on the contest between
the heirs at law and legatees over the probate of the will
of 1883, for the purpose of proving that the will of 1883
had been revoked, and, based upon his testimony, in part
at least, the probate court decreed that that will had been
revoked by "making and publishing another will contain-
ing a revocation clause expressly revoking all former
wills." The legatees conceded to the heirs at law 60 per
cent. of the large estate, carefully protecting the percent-
age contracts of the attorneys for both sides, rather than
take the risk of further contest, and both sides now make
common war upon the principal witness, who testified to
the existence of the revoking will.

We do not question the right or the duty of the circuit
judge to question witnesses, and to see that the facts are
properly brought before the jury, but in so doing it is his
duty to so frame his questions as not to indicate his own
opinion, and not to lay undue stress upon particular features
of a witness' testimony tending to impeach him. We
think that the course pursued by the trial judge in this in-
stance constituted reversible error. *Spalding* v. *Lowe*, 56
Mich. 367 (23 N. W. 46); *Grand Rapids, etc., R. Co.* v.
*Martin*, 41 Mich. 667 (3 N. W. 173); *Chase* v. *Buhl Iron
Works*, 55 Mich. 139 (20 N. W. 827); *Wheeler* v. *Wallace*,
53 Mich. 356, 364 (19 N. W. 33, 37); *Wilson* v. *Hotchkiss'
Estate*, 81 Mich. 172 (45 N. W. 838); *Sterling* v. *Calla-*

*han,* 94 Mich. 536 (54 N. W. 495); *Cleveland Co-operative Stove Co.* v. *Mallery,* 111 Mich. 43 (69 N. W. 75); *Abbott* v. *City of Detroit,* 150 Mich. 245 (113 N. W. 1121); *Williams* v. *City of West Bay City,* 119 Mich. 395 (78 N. W. 328); *Buell* v. *Adams, ante,* 248 (121 N. W. 752); *Hine* v. *Commercial Bank,* 119 Mich. 448 (78 N. W. 471).

Assignment No. 31 challenges the correctness of the following portion of the charge:

"While this is a proceeding to probate an alleged lost or suppressed will, as stated in the requests I have given you, at proponent's request, it is more than that, gentlemen. It is a proceeding to probate an alleged lost will depending on the verbal testimony, character, honesty and memory of men and women to take the place of a written will and testament, visible before your eyes; and, before you wipe it out by verbal proof, you should be satisfied that truth and justice alone impel you to act, and that proponent's proofs, upon every point necessary for him to establish, clearly and unquestionably preponderate in favor of each proposition I have charged you it is necessary for proponent to establish."

This instruction was clearly erroneous under repeated decisions of this court. *Hoffman* v. *Loud,* 111 Mich. 156 (69 N. W. 231); *Ewing* v. *McIntyre,* 141 Mich. 506 (104 N. W. 787); *Walsh* v. *Taitt,* 142 Mich. 127 (105 N. W. 544).

Counsel for contestants contend, however, that the error of this instruction was obviated by correct statements of the rule in earlier portions of the charge. We are unable to agree with this contention. The instruction complained of constituted the last paragraph but one in the charge, and was the final rule of law delivered to the jury by the court upon this subject. It immediately followed the following eloquent and impressive language:

" Next to those inalienable rights to enjoy life, liberty, and the pursuit of happiness, for which our fathers fought, is that sacred right to have, hold, and enjoy the material fruits of the labor of the hand or brain, and as life's short

day declines, and the shadows deepen around one, and that mysterious darkness falls, and the hand is stretched forth to grasp the blessed hope and promise of the ages, and all material things are laid aside forever, the right to know that all earthly interests are settled and disposed according to the dictates of that mind and conscience whose only right it was to will the same is such a precious right that he who seeks to pervert it, and to that end is influenced by any consideration whatsoever, other than the very act of the testatrix, whether such act meets with his approval or not, is a robber of the living and a defrauder of the dead."

In view of this solemn adjuration and the contrast between the written and the verbal proof, it cannot be said that the instruction could not have been prejudicial. It would be more reasonable to hold that the instruction that, before the jury would be justified in "wiping" out the written will "visible before your eyes," they should be satisfied "that proponent's proofs, upon every point necessary for him to establish, *clearly and unquestionably* preponderate in favor of each proposition," must have been prejudicial.

The judgment is reversed, and a new trial granted.

OSTRANDER, HOOKER, MOORE, and McALVAY, JJ., concurred.