*In re* McINTYRE'S ESTATE.

EWING *v.* LAMPHERE.

1. NEW TRIAL—APPEAL AND ERROR—WEIGHT OF EVIDENCE.

It is the statutory duty of the Supreme Court, on a writ of error from the denial of a motion for new trial, to examine the testimony and determine for itself whether or not the verdict is so plainly against justice as to call for a new trial.

2. WILLS—LOST INSTRUMENT—MEMORANDUM OF CONTENTS.

A memorandum of decedent's alleged lost will containing inconsistent provisions and bearing internal evidence of its spurious character is insufficient to support a verdict admitting the claimed will to probate.

BLAIR and MOORE, JJ., dissenting.

Error to Wayne; Brooke, J. Submitted October 8, 1909. (Docket No. 23.) Reargued January 7, 1910. Decided March 5, 1910.

Petition by Augusta Ewing for the probate of a lost

will, alleged to be the last will and testament of Archibald P. McIntyre, deceased. Delos McIntyre and others filed objections. The petition was denied in the probate court, and proponent appealed to the circuit court. A judgment for proponent is reviewed by contestants on writ of error. Reversed.

*Bowen, Douglas, Whiting & Eaman* (*James O. Murfin* and *Otto Kirchner*, of counsel), for appellant.

*Maybury, Lucking, Emmons & Helfman* (*Harrison Geer*, of counsel), for appellee.

HOOKER, J. Archibald P. McIntyre, a widower, died, leaving no issue, in May, 1900. Two brothers living in New York, a sister living in Wisconsin, and a daughter of a deceased brother were his next of kin. After McIntyre's death, administration of his estate was commenced and the property partly distributed when a petition was filed by one Augusta Ewing for the probate of an alleged will, asserted to have been lost or suppressed. The petition was denied in probate court, and the cause was appealed to the circuit, where, after several trials, a verdict was rendered in favor of the proponent, and the cause was brought to this court by Helen Lamphere, McIntyre's niece hereinbefore mentioned.

To prove the execution of the alleged will, the following testimony was produced: One Mrs. Yerkes, McIntyre's housekeeper or servant, testified that she was called in to witness a will which McIntyre then and there signed in the presence of one Squire Smith, who drew it, and one John Williams, who chanced to be in the hotel at the time. She testified, further, that McIntyre took possession of the will, that he kept his papers in a desk and tin box in his bedroom. Some hours later she found a paper in the room where the will was executed, which she laid on the table, intending to give it to McIntyre, but she overlooked it, and after his death several years later she found it among her papers. She did not read or hear the

will read. John Williams testified to witnessing the will, which he heard read, and stated the substance of its provisions. A paper said to have been the one found by Mrs. Yerkes was produced, and purported to be memoranda for a will of Archibald McIntyre, and two sons of Smith, the alleged scrivener, testified with much positiveness that it was in the handwriting of their father. Mrs. Yerkes testified that one Harold McIntyre, a nephew of the deceased, who was with him during his last illness, had possession of the key to his desk and the opportunity to abstract this will; that after the funeral the papers were taken to New York by him and his uncle, Delos McIntyre. Mrs. Yerkes testified before the probate court, and shortly before the cause was to be heard on the circuit she committed suicide. It is contended by the appellant that she did this from remorse, and reluctance to repeat false testimony, and the feeling of shame that would follow a public admission of her misconduct, while the claim is made on behalf of the appellee that her act was caused by threats made to her by friends of the appellant, and her fear of prosecution and imprisonment for perjury charged to have been committed in the probate court. These claims are based upon the testimony of one or more witnesses produced by the appellee of a conversation with Mrs. Yerkes prior to her death, in which her reluctance to testify again was made manifest. This testimony seems to have been drawn out by counsel for appellant on cross-examination of proponent's witnesses. No objection appears to have been made to it.

Attention was called by counsel to two provisions of the memoranda for the will that are said to indicate its spurious character. It may be best shown by quoting from the language of the learned circuit judge in disposing of the motion for a new trial. He said:

"There is another feature that deserves attention, in view of the uncontradicted testimony in the case that the sister of Archibald McIntyre, living in Wisconsin, lived up to within a few weeks of the death of Archibald Mc-

Intyre, and likewise in view of the fact that it was conclusively shown that McIntyre knew of his sister being alive the paragraph in the will reading as follows: 'I give to the grandchildren of my deceased sister in Wisconsin, $5,000—is peculiarly significant. It is alleged that this provision was made in the fall of 1896. This was four years before this woman spoken of in this paragraph as the deceased sister died. Another peculiar paragraph in the will is the following:

"'I give to the person who has stayed with me and managed my household affairs and cared for me for at least two years, including the entire period of my last sickness, the hotel and contents thereof.'

"In September, 1896, there was no person answering to this description. The last sickness of the contestant did not occur for nearly four years thereafter, and Mrs. Yerkes had at the time of the making of the alleged will been in the employ of the deceased but a few months. In spite of these inconsistencies, and the demonstrated character of the witnesses (Yerkes and Williams), the jury reached the conclusion that they should be believed."

We held in the case of *Hintz* v. *Railroad Co.*, 132 Mich. 305 (93 N. W. 634), that it was the duty of this court to review the evidence in a cause to determine whether a ruling upon a motion for new trial upon the ground that the verdict was contrary to the weight of evidence was erroneous. We cannot escape this responsibility which was doubtless imposed by the legislature to provide relief against palpable miscarriages of justice through unjust verdicts, which all judges and lawyers know to be not uncommon. In the exercise of this power this court cannot content itself with a mere determination that there is a conflict of evidence, and that the jury is as well qualified to judge of the facts and the credibility of testimony as itself, which was the rule before, or that the trial judge has approved the verdict or even expressed his own belief that the verdict is not against the weight of evidence, and thereupon affirm the denial of a motion, but it must examine the testimony and determine for itself whether or not the verdict is so plainly against justice as to call for a

new trial.     That this statute may be disapproved by those who entertain the idea that the verdicts of juries are necessarily and invariably honest, candid, discriminating, and just does not affect the question.     Evidently the legislature has recognized the common belief that jurors have their foibles and juries their faults which interfere with the ideal administration of justice, and has attempted to apply a remedy by enlarging the rule heretofore adopted and followed by the appellate courts.     It had the power to confer such authority upon the appellate courts.

We have endeavored to make a careful and critical examination of the evidence in this case.     We are satisfied that the testimony of both John Williams and Mrs. Yerkes was untruthful.     It is upon the testimony of these two witnesses that the verdict must rest, for no other witness ever saw or knew anything about a will made by deceased.     Mrs. Yerkes was housekeeper or servant for McIntyre.     She testified that she knew him five years before his death, and was employed in his house (a hotel) about four years and six months, and that the will was made in September or October, 1896.     This was before she had been there a year, yet it is claimed that the hotel and farm, said to have been worth $20,000, was bequeathed to her.     We think that the memorandum introduced as evidence of the contents of the alleged will contains strong internal evidence that it is spurious.     The charges made by Mrs. Yerkes against Harold McIntyre in relation to the abstraction of the alleged will and money are contradicted.     These papers were taken by the next of kin, who presumptively were the proper persons to take them. There is no complaint made by any of them, and at the time the papers were taken there was no reason to suppose that the proponent and her associates had any interest in them.     Indeed, it may be thought by some that the sequel has proved that a wise precaution was exercised by Harold and Delos McIntyre in keeping possession of the documents found in the desk and box.     Their denial of any abstraction of a will or other paper by themselves or any

one else is as credible as the statements of Mrs. Yerkes, and to our minds much more so. Furthermore, this is a case where the learned circuit judge who tried it, although denying the new trial, has unequivocally expressed his own disbelief in the crucial testimony upon which the verdict rests, and his own nonconcurrence with the determination of the jury. His reason for denying the motion was a not unnatural reluctance to overrule the conclusions of the jury regarding the credibility of witnesses and the value of human testimony. In this he thought that he found support in the opinion of this court rendered upon a former hearing of this cause. See 141 Mich. 506 (104 N. W. 787).

Notwithstanding this, he denied the motion only upon the unprecedented condition that the appellee should file a bond in the sum of $1,000 conditioned to pay the costs of appeal should the judgment be reversed. Of the opinion in the case cited it should be said that it was before this court on an appeal by proponent from a directed verdict. Necessarily the testimony was discussed from the standpoint most favorable to the proponents, with a view merely to the determination of the propriety of taking the case from the jury, which was the only question involved. Indeed, the writer of the opinion said:

"*The sole question, therefore, under the charge, is whether there was any evidence in the case legitimately tending to overcome the prima facie presumption of revocation arising from the nonproduction of the will.*"

We are constrained, therefore, to reverse the judgment, with costs against the proponent.

A new trial is ordered.

MONTGOMERY, C. J., and OSTRANDER, McALVAY, and STONE, JJ., concurred with HOOKER, J.

BLAIR, J. (*dissenting*). This case made its first appearance in this court in the January term, 1903. A verdict was directed for contestants by the trial court, and

the judgment entered thereon was reversed by this court on writ of error prosecuted by the proponent. *Ewing* v. *McIntyre*, 133 Mich. 459 (95 N. W. 540). The case having been retried before a jury, a second verdict was directed in favor of contestants, and the judgment entered thereon was again reversed by this court on writ of error prosecuted by proponent. *Ewing* v. *McIntyre*, 141 Mich. 506 (104 N. W. 787). In June, 1906, the case was tried before a jury and resulted in a disagreement. The case was a third time before this court at the January term, 1907, upon a collateral phase, where a decree of the circuit court in chancery sustaining the demurrer of contestants was reversed. *Ewing* v. *Lamphere*, 147 Mich. 659 (111 N. W. 187, 118 Am. St. Rep. 563). The case is now before this court upon writ of error prosecuted by counsel for contestants to review the judgment entered upon the verdict of the jury in favor of the proponents and finding in answer to special questions, as follows:

" (1) Did Archibald McIntyre in September or October, 1896, execute a last will and testament in the presence of Emma A. Yerkes and William A. Smith?
" Yes.
" (2) If you answer the foregoing ' Yes,' did Archibald P. McIntyre die in May, 1900, believing that said will so executed by him was in existence, and would control the disposition of his estate?
" Yes.
" (3) If both the foregoing questions are answered ' Yes,' does Exhibit 1 contain the provisions of that will?
" Yes."

The principal question in the case now before us is whether the trial court erred in refusing to grant a new trial on motion of contestants upon the ground that the verdict was against the weight of the evidence. For a statement of the facts I refer to the opinion of the court in *Ewing* v. *McIntyre*, 141 Mich. 506 (104 N. W. 787), with such additions as I shall indicate in the course of this opinion. As in the case of most will contests, this case involves a sharp conflict in the testimony.

Upon every important element of the case there is substantial testimony upon both sides. The testimony, however, upon the last trial was vastly stronger in favor of proponents, since the alleged memorandum draft of the will (Exhibit 1), having theretofore been excluded from consideration by the jury, was, in accordance with the opinion of this court in 141 Michigan, submitted to the jury for their consideration. Mr. Smith, the scrivener of the will and one of the attesting witnesses, died a few months after the death of Mr. McIntyre. Mrs. Yerkes, the other subscribing witness to the will, whose testimony was taken in the probate court, committed suicide prior to the first trial in the circuit court. One John Williams claimed to have been present at the time of the execution of the will and to have heard it read over and testified to its contents.

The most important question of fact in the case concerns the authenticity of the alleged memorandum for the will. Contestants strenuously urged that this instrument was a forgery, and in my opinion their whole contest is involved in that contention. If, as a matter of fact, this memorandum was a genuine instrument, it is difficult to perceive any substantial ground upon which the verdict of the jury can be attacked as being against the weight of the evidence. This memorandum was supported (1) by the testimony of Mrs. Yerkes that she found this memorandum near the place where the scrivener had sat at the table when the will was executed, some hours later, and accounting for its unchanged condition from that time on; (2) by the testimony of two sons of the scrivener, Mr. Smith, that the memorandum was entirely in the handwriting of their father; (3) by the testimony of numerous witnesses that the testator had declared to them that he had made a will, and that Squire Smith had drawn it; (4) by the testimony of numerous witnesses that the testator was hostile to his brothers, and was determined that they should have no share in his estate; (5) that the memorandum, in considerable part at least, confirmed the previ-

ously expressed intentions of the testator; (6) by the testimony of John Williams as to the contents of the will read over in his presence. On the other hand, the authenticity of the memorandum was impeached by the testimony of a daughter-in-law and a handwriting expert, who testified that it was not in the handwriting of Smith, in their opinion; by alleged inconsistencies and contradictions in the testimony of Mrs. Yerkes and John Williams and the inherent improbability of their stories; by the declarations of Mrs. Yerkes, inferring perjury on her part and conspiracy to forge the memorandum and will; by the testimony of numerous witnesses to the declarations of the testator that he had not made a will and never intended to, but was satisfied with the disposition made by the laws of this State; and, it is alleged, by the internal evidence of the memorandum itself.

The two sons of Mr. Smith, who were men of apparent respectability, unimpeached, and who testified that they were familiar with their father's handwriting, swore positively that the memorandum was in his handwriting. So far as the direct evidence of handwriting is concerned, it cannot be questioned that the testimony was as strong in support of proponents as of contestants, and it appears to me that the positive testimony of the two sons, having no interest whatever in the result of the suit, that the handwriting was their father's, standing alone, would justify the verdict of the jury in favor of the fact testified to against all the other testimony in the case. The authenticity of the memorandum, however, does not rest upon the testimony of handwriting alone, but is supported by numerous cogent facts testified to by many respectable witnesses who were unimpeached, and whom the jury had an undoubted right to believe as to declarations of the testator that he had made a will with provisions in harmony with the contents of the memorandum. For instance, Mr. Hamilton Baluss, an attorney at law, who testified that he was an intimate friend of the testator, swore that a

year or two before his death he had a conversation with Mr. McIntyre in which—

"He said that he had a housekeeper that was a good one, and that he got along first rate with her, and that she was very kind to him. He sounded her praises, and I says, 'Well, Arch, you haven't got any children; and, if that woman stays with you, you ought to provide for her in case of your death, if you don't get married.' I says, 'you ought to provide for her.' He says, 'that is just what I have done, Mr. Baluss. I have made my will and I have provided for her so that she will never want if I drop away.' He says, 'I have got some relatives in the East, but they never helped me get what I have got, and I have got some friends here that I propose to remember.' "

Mr. Lafayette C. Hall, postmaster of Plymouth, testified to having a talk with testator in 1896 or 1897 at his hotel, when McIntyre was having a talk with Squire Smith relative to probate matters, and discussing the possibility of wills being contested, etc. After that he had another talk with Mr. McIntyre.

"He seemed to want to fully understand. Among other things, he said that he was anxious to know my experience, from the fact that he expected that it might be possible that his will might be contested at some time; that he had some brothers in the East that he would expect would contest his will perhaps, inasmuch as he had not provided for them. I don't know just what that conversation was, word for word, but anyway he said to me, as I remember it, more distinctly, that if he could prevent it that his brothers should never have a damned cent of his property."

There was also much testimony to the effect that Mr. McIntyre was very fond of Eva Kenyon and intended to provide for her, and after her death that he had provided in his will for her children, and that William Ewing was the executor of his will.

It is difficult to believe that all of these witnesses were testifying falsely, and, in fact, no such contention is made. It is also difficult to believe that Mr. McIntyre, in serious conversations which he had with his intimate

friends with reference to his property, was unnecessarily
and deliberately deceiving them by statements that he had
made his will, that Squire Smith had drawn it, and that
he had provided for various people therein, and had ap-
pointed a certain man executor. As between testimony
of opposing declarations upon the subject of his will, it
would seem that a man would be more likely to falsely
deny having made a will than to falsely state with posi-
tiveness that he had made one and had made certain dis-
positions of his property, which, if known, would invite
the importunities of those who had not been remembered.
At all events, this testimony presented a square issue of
fact for the consideration of the jury, and no court would
be warranted in overturning the finding of the jury in
favor of the facts testified to by the witnesses for propon-
ents in this respect. There was therefore an abundance of
testimony from unimpeached witnesses, who, so far as the
record discloses, were men of respectability and standing
in their community, that the testator had stated to them
that he intended to make a will with provisions consistent
with the memorandum. There was also an abundance of
testimony from witnesses of like character that the testa-
tor stated to them that he had made a will, and that
Squire Smith had drawn it. There was also testimony
from which, as we have heretofore held (141 Mich. 511
[104 N. W. 787]), the jury might have inferred a spolia-
tion of the will by those interested in its destruction. The
establishment of the will, therefore, does not rest upon
the uncorroborated testimony of Mrs. Yerkes and John
Williams. The authenticity of the memorandum does
not depend upon the testimony of Mrs. Yerkes at all, but
upon that of the two sons, who positively affirmed its
genuineness. Mrs. Yerkes' testimony related only to the
finding of the paper and its preservation. Williams'
testimony did not relate to the memorandum at all. The
principal internal evidence relied upon for the discrediting
of their testimony, which is in harmony with the facts to
which I have called attention, is (1) the statement in the

memorandum, "I give to grandchildren of my deceased sister in Wisconsin $5,000;" (2) the provision, "I give to the person who has stayed with me and managed my household affairs and cared for me for at least two years including the entire period of my last sickness, the hotel." etc. The observations of the trial judge with reference to these points are set forth in Justice HOOKER'S opinion. The opinion of Mr. Justice HOOKER that the memorandum "contains strong internal evidence that it is spurious" is apparently based upon the same considerations. It seems manifest that, if they are in error as to the conclusions to be drawn from these provisions of the memorandum, their opinions lose much of their support.

*First.* As to the grandchildren of his deceased sister: The circuit judge was of the opinion that it was conclusively proved that Mr. McIntyre knew at the time of the alleged will, or memorandum, that his sister was alive. I think it clear that the trial judge was mistaken in this conclusion. On January 5, 1896, Mr. McIntyre wrote to his brother Franklin in New York, from which letter I quote, as follows:

"REDFORD, January 5, '96.

"Dear Brother:—I received yours at hand and was glad to hear from you. I haven't heard from down there so long that it seems good to know that you was alive. I had not heard that Herrick Babcock was dead. Now I don't hear from any of them. I am a lone man here and no one writes to me," etc.

Testator's Wisconsin sister was the wife of Herrick Babcock, and it is apparent from the letter that he was not in communication with her at the date of his letter, and had not been for a considerable time. He had no letters from Wisconsin to inform him whether she was dead or alive. George E. Seely, who testified that his business was that of farming and buying cattle, said that he was well acquainted with Mr. McIntyre, and that about three years before he died, and while Mrs. Yerkes was there as his housekeeper, he said that his sisters were

both dead, one of whom lived in York State and the other in Wisconsin.

"He said his brothers were better off than he was, and they wouldn't get any of his property. He said his sisters were both dead. He didn't say anything about his sister's children."

There is nothing to impeach the credibility of Mr. Seely's testimony except the testimony of the Wisconsin sister's grandchildren, who, in order to secure their grandfather's estate in Wisconsin, procured an adjudication that their father was dead. In order to secure a portion of their granduncle McIntyre's estate in Michigan, they caused a sworn petition to be presented in favor of their resurrected father and obtained a settlement. Their granduncle, Delos P. McIntyre, having died in New York, their father was again consigned to the tomb, and they sought a share of Delos' estate. I think it satisfactorily appears that the testimony of these witnesses of the receipt of a letter from testator in the spring of 1896 comes from persons of such character that the jury would have been justified in disbelieving their testimony, so far as it related to this letter, which was not produced. Furthermore, if the jury were convinced that the memorandum was genuine, the memorandum itself was evidence that the testator had told Mr. Seely that Mrs. Babcock was dead. I am satisfied that the testimony as to Mr. McIntyre's knowledge of his sister's existence clearly presented a question of fact for the jury.

*Second.* With reference to the second point, that there was no person answering to the description given in the language quoted from the memorandum, it seems apparent to me that this point proceeds upon a misinterpretation of the provision itself. The essence of this point is that the language used shows that the paper was drawn after the death of Mr. McIntyre, and is inconsistent with the theory that it was made in his lifetime. It must be borne in mind that the scrivener, while admitted to the

bar, was a practitioner before the justices' courts, and, for the most part, in the rural district where he resided, and was not a lawyer of extensive practice, and that the language of the papers as sworn to by his sons was his language.  If the language used, when properly construed, is in harmony with the view that the paper was made in 1896, then the objection must fail.  Supposing that the paper was made, as claimed, in Mr. McIntyre's lifetime, then it is plain that, as his last sickness had not occurred, the period of last sickness referred to in the memorandum was a provision relating to the future, and it seems to me entirely clear that this whole provision relates to the future and not to the past, and should be understood as though it read as follows:

"I give to the person who shall have stayed with me and managed my household affairs and cared for me for at least two years, including the entire period of my last sickness, the hotel," etc.

The will would speak from the date of the testator's death, and the provision, "I give to the person who has stayed with me * * * *for at least two years* including the entire period of my last sickness"—indicates a limitation of the time previous to his death by way of condition precedent.  It is true that in 1896 Mrs. Yerkes had not stayed with Mr. McIntyre for at least two years. It is equally true that Mr. McIntyre's last sickness had not then occurred, and, if the memorandum were made in 1896, the only reasonable construction of the language in question would be that it referred to services preceding his death and extending over a period of at least two years prior thereto.  I think, therefore, that, so far as the reasons assigned for disbelieving the witnesses rest upon internal evidence of the memorandum, they do not support the argument.  Doubtless, there is much cause for suspicion of the testimony of these two witnesses, and, if their testimony had been uncorroborated by the memorandum and the testimony of a multitude of other unimpeached witnesses, doubtless the jury would have reached

a different result. In their view, however, the unimpeached evidence must have been satisfactory that Mr. McIntyre made a will, and that Mr. Smith drew it, and that the memorandum was authentic and cogent proof of the contents of that will. The mere fact that the trial court disagrees with the conclusion of a jury as to the preponderance of the evidence or the credibility of witnesses is not sufficient to justify the granting of a new trial. Much less would it justify this court in overturning his decision refusing a new trial. *Wheeler* v. *Jenison*, 120 Mich. 422, *vide* page 428 (79 N. W. 643); *Saginaw Milling Co.* v. *Mower*, 154 Mich. 620 (118 N. W. 622).

In *Wheeler* v. *Jenison*, the circuit judge said, in overruling a motion for a new trial:

"One of the principal reasons alleged on the part of the defendants for a new trial in this case is that the verdict of the jury was against the weight of the evidence. In the opinion of the court that was true."

Considering what the court further said, the judgment was affirmed. In the instant case the trial judge, after stating his disagreement with the verdict and his disbelief of the testimony of Mrs. Yerkes and John Williams, proceeded as follows:

"Under our system of jurisprudence, it is the function of the jury to determine the value of testimony, and I have always been loath to disturb findings of fact made by juries. The jury in this case was out upwards of 24 hours, and had ample opportunity for discussion. I am extremely loath to substitute my judgment as to the credibility of the two witnesses named for that of the jury. Particularly am I impelled to this conclusion by reason of the language of our Supreme Court when it had this case before it for consideration (see *Ewing* v. *McIntyre*, 141 Mich. 506 [104 N. W. 787]), where the court said:

"'Considering the testimony in the light of these rules, the jury would have been warranted in finding,' etc.

"I think it is conceded by counsel for contestants that the case made by the proponents on this trial is at least as

strong as the case made upon the former trial, the consideration of which elicited the foregoing language from the Supreme Court."

In my opinion the court proceeded upon a ground that should influence, not only trial courts, but this court as well, in considering the credibility of witnesses, viz., that they should be extremely loath to substitute their judgments as to the credibility of witnesses for that of the jury.

"Where the correctness of the verdict depends on the credibility of witnesses, it should seldom be disturbed." 29 Cyc. p. 830c, and notes.

The credibility of witnesses has always been regarded as a subject whose determination is peculiarly within the province of the jury. It was said in *Mawich* v. *Elsey*, 47 Mich. 10 (10 N. W. 57):

"As the trial involved an inquiry into the credibility of witnesses and included the duty of drawing collateral inferences, it is not an occasion for the court to test the result by applying thereto its own judgment, and it matters not what our opinion may be of the abstract justice of the verdict."

In *People* v. *Girdler*, 65 Mich. 69 (31 N. W. 625), it was said:

"Whatever may be our opinion of the truth or probability of Campbell's testimony, we cannot interfere, nor could the court below, with the province of the jury. It is for them to weigh and pass upon the truth or falsity of Campbell's story. If they found it true, they were warranted in finding the respondents guilty, whether there was any other evidence in the case or not. The court instructed the jury, in effect, and clearly enough, that they must acquit the respondents unless they believed the criminal act was committed as testified to by Campbell. The jury must, therefore, have believed him, and their judgment in that respect cannot be disturbed by us, and could not be controlled by the trial court."

In *Ball-Barnhart-Putnam Co.* v. *Lane*, 135 Mich. 275 (97 N. W. 727), it was said:

" The plaintiffs' proof of title was not complete without the testimony of Rice.    It is contended that, as Rice was a self-confessed thief, his credibility was for the jury. We are constrained to hold that this contention should prevail."

See, also, *Payne* v. *Union Life Guards*, 136 Mich. 416 (99 N. W. 376, 112 Am. St. Rep. 368); *Muir* v. *Kalamazoo Corset Co.*, 155 Mich. 624 (119 N. W. 1079).

These cases are not cited as negativing the right of the trial judge to grant a new trial where his determination involves the credibility of witnesses, but as showing the emphasis which this court has placed upon, and the importance which it has attached to, the exclusive right of the jury to finally determine the credibility of witnesses, and as bearing upon the rule which should be followed in the granting of a new trial.    The statute has made no change in the rules which should govern the trial judge. It has merely authorized this court to review his decision in the manner pointed out in *Hintz* v. *Railroad Co.*, 132 Mich. 305 (93 N. W. 634).    In my opinion the rule should be that neither the trial court nor this court should set aside a verdict upon its opinion as to the credibility of witnesses unless the other evidence in the case is so overwhelmingly against the credibility of those witnesses that the conclusion cannot be escaped that the jury were influenced by something other than the testimony.    See *Churchill* v. *Mace*, 148 Mich. 459 (111 N. W. 1034).    I am therefore of the opinion that it cannot be said that the verdict of this jury was against the weight of the evidence, or that the testimony of the witnesses referred to was so incredible that their verdict should be set aside because they gave it credence.    In view of the fact that the granting of a new trial would open the case to all proper objections to the receiving of testimony, I have, in coming to the conclusion which I have reached, excluded from consideration such portions of the testimony of witnesses tending to impeach the testimony of Mrs. Yerkes as her attention was not called to upon the witness stand.

In my opinion the interests of justice do not require a retrial of this case. For over eight years it has been dragging its weary way through the courts. The delay has been caused by the successful efforts of contestants to obtain verdicts in their favor by direction of the court upon grounds held to be untenable by this court. The verdict of a jury, entitled to the same presumption of honesty and good faith that attaches to the action of the courts, has been had upon the merits, upon testimony that involved the most important of their functions, the testing of the credibility of witnesses, and that verdict finds the will established. The charge of the court was eminently fair towards contestants and they were represented by eminent counsel, who placed their case before the jury in its most favorable view, and placed before them the proponents' case in its most unfavorable light. I see no good ground for anticipating a different result upon another trial, and I think the judgment should be affirmed.

MOORE, J., concurred with BLAIR J.