BROWN v. ANN ARBOR RAILROAD CO.

1. CARRIERS—NEGLIGENCE—ALIGHTING FROM TRAIN.
   In an action for personal injuries sustained by plaintiff in alighting from a train, his vague and equivocal testimony that he was thrown off by the jerking of the train, contradicted by his admissions made to seven different persons after the accident to the effect that he tried to board the train again after it started up, *held*, to require

the court to set aside the verdict as contrary to the great weight of the evidence.

2. SAME—RELEASE OF DAMAGES—TENDER.

Where defendant's claim agent effects a settlement with plaintiff stating that there was no liability and whatever he received was a gratuity and the testimony for the plaintiff showed that he had not knowingly executed a release and did not authorize any one else to sign the instrument, a return of the money which plaintiff received was not essential to enable him to bring suit, nor could it be held as matter of law that the release was conclusive or binding between the parties.

3. EVIDENCE — MEDICAL TESTIMONY — EXPERT EVIDENCE — HYPOTHETICAL QUESTION.

On the trial of a personal injury action, the court should have refused to admit in evidence the testimony of plaintiff's medical expert, in answer to a hypothetical question relating to the condition of plaintiff after he had been given certain opiates, and had his arm cut off, what would be plaintiff's condition after having his arm removed and taking 1½ ounces of chloroform, 1/30 grain of strychnine, ¼ grain of morphine and on the next day ⅛ grain of morphine by hypodermic injection, and some ⅛ grain tablets of morphine, and on the following day ⅛ grain of morphine and more tablets, on the next day three ⅛ grains by hypodermic injection and more tablets given internally, and on Thursday, the next day, one hypodermic injection and more tablets, and whether he would be able to comprehend what he was doing on Friday morning, following; the number of morphine tablets should have been stated in the question: the witness could not intelligently pass on the effect of an unknown quantity of drugs given at uncertain intervals.

Error to Shiawassee; Kinne, J., presiding. Submitted November 19, 1914. (Docket No. 20.) Decided December 19, 1914.

Case by Marvin S. Brown against the Ann Arbor Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Cavanaugh & Burke (Alexander L. Smith* and *Gustavus Ohlinger,* of counsel), for appellant.

*A. J. Sawyer* and *Arthur Brown,* for appellee.

STONE, J. In this action, the plaintiff, a man 62 years of age, seeks to recover damages for an injury resulting in the loss of his right arm, on the evening of July 27, 1913, while alighting from a car as a passenger on a passenger train of the defendant going from Toledo, Ohio, to Durand, Mich. The declaration alleges the negligence of the defendant as follows:

"And said plaintiff further avers that said train had proceeded upon its journey from the city of Toledo to the village of Durand, and after said train had stopped at said village of Durand and after an agent and employee of defendant, commonly called a brakeman, had passed through the car upon which the plaintiff was a passenger and had notified plaintiff and the other passengers upon said car that said train had arrived at the village of Durand and that it was time for plaintiff and said other passengers to depart from said car after said train came to a stop, by calling the station 'Durand,' and while said plaintiff was in the act of going down the steps of one of the cars of said train, upon which car said plaintiff was a passenger, and as plaintiff was about to step from such car upon what he supposed was the platform of the station house at said village of Durand, the said defendant suddenly caused said train to start forward, and said plaintiff, while in the exercise of all due care and caution on his part, and through the fault and negligence of defendant, was thrown under the wheels of said train and was dragged along said railroad track for a long distance, to wit, a distance of 50 feet, and plaintiff's right arm was so crushed and mangled that it had to be amputated at or near the shoulder."

To the plea of the general issue there was added a notice that, if there was any liability on the part of the defendant, the same was satisfied and discharged

by the said plaintiff, and the said defendant was released by an instrument in writing from all liability.

This accident occurred about 11 o'clock p. m. at a point some 600 to 800 feet south of the station at a crossing where the train was required by law to stop. No person save the plaintiff gave testimony of the manner in which the injury occurred. He testified on direct examination as follows:

"After the train left Byron it had been running about 20 minutes and came to a standstill again, slowed down and stopped, the brakeman came through the door and cried out 'Durand.' I rose right up and had my arm right on the arm of the seat and stepped out into the aisle and I met him. I looked and saw others getting up. He went on down, and called out 'Durand' toward the other end of the car. I stepped out. As I took the second step down the steps the train started with a jerk and threw me, and I grabbed with my right hand and got something; it was terribly dark, I couldn't tell what.

"*Q.* Did you suppose, at that time, that you were going to step off at Durand?

"*A.* Why certainly, I supposed so.

"*Q.* When the train stopped and the brakeman came through and announced 'Durand,' and you got up and met him in the aisle, did you follow him out, or did you come out the back door?

"*A.* I came out the back door and he went right up through.

"*Q.* And as you got to the back door you heard him call 'Durand' again?

"*A.* Yes, sir.

"*Q.* You had got to where the train threw you when you got on the second step on the train; from there what happened?

"*A.* As it threw me, I turned my right hand and grabbed something. I went off on the ground with my feet. I saw I was fast; I don't know what to, but my coat was fast. I ran along and tried to get loose and to get onto the train. I couldn't do either one. The train was going so fast that I lost my feet,

183 Mich.—37.

and then I guess I must have lost consciousness, for I didn't know anything until I came to, lying beside the track."

On cross-examination the following question and answer appear:

"*Q.* So if your coat had not caught when you jumped off or were thrown off you would have been all right?

"*A.* Certainly I would. I would have lit on the ground good and walked in. My coat catching is what caused the accident."

Opposed to this version, as testified to by plaintiff, there were many witnesses who testified to hearing accounts given by the plaintiff of the manner in which the accident happened, which are entirely inconsistent with his testimony. One Thomas Downer, the night watch and marshal at Durand and one of the plaintiff's witnesses who talked with him at the hospital three or four days after the accident happened, testified on cross-examination as follows:

"*Q.* Didn't you say to the doctor that he told you he got off, attempted to get on and slipped?

"*A.* Something like that; yes, sir.

"*Q.* Is that what Mr. Brown told you?

"*A.* Yes, sir.

"*Q.* He got off and the train started up and he attempted to get on again?

"*A.* Yes, sir.

"*Q.* And he fell as he attempted to get on?

"*A.* Why he slipped, or something like that."

He testified on redirect examination:

"*Q.* His clothes were caught?

"*A.* I don't know; he didn't say anything about his clothes."

Dr. Fair, an employee of defendant and the physician who amputated the arm, testified as follows:

" * * * I heard Mr. Brown make a statement to Reifsnider and to myself about the manner in which the accident occurred. When he made the statement he was in the full possession of his faculties. He stated to me, as near as I can remember, he got off the train, the train stopped, and he got off, and it started up again. He found he was out away from town, as it started up, and he caught hold of it to get on, and slipped or dragged or something, and he fell down and his arm got under the wheels.

"*Q.* Did he make any claim at that time that his coat or anything caught on the train?

"*A.* No, sir.

"*Q.* Were you present when he made the statement to Mr. Reifsnider?

"*A.* I was.

"*Q.* When he made the statement to Mr. Reifsnider, state whether or not Mr. Reifsnider told him that, based on his own statement, the railroad company was not liable?

"*A.* He did."

Elbert Henry, the supervisor of Vernon township, testified:

" * * * I heard Mr. Brown make a statement as to how this accident happened. He didn't make it to me personally, and I cannot recollect the men who were in the room when he made it. He said the brakeman came through the train and called out 'Durand,' and the train stopped and he got off, and he started to get back on as the train moved, and he slipped and fell."

Clarence Sproul, a switchman for the Grand Trunk Railroad Company, testified as follows:

"I asked him how he got hurt. He said he got off the train and went to get back on again and slipped."

Again:

"He said when he got off he thought it was Durand, and found it was not, and went to get back on."

A. B. C. Doak, a brakeman for the Grand Trunk

Railroad Company who was with Mr. Sproul that night, testified to the following conversation with the plaintiff:

" * * * I asked him how he got hurt, and he said he heard the station called 'Durand station,' and went out on the platform and got off, or something, and stepped off, and the train started like, and he went to turn back to get on and slipped or fell, something to that effect."

Roy Cook, another employee of the Grand Trunk, was also present when the plaintiff was picked up, and he testified:

"I heard the conversation that took place between Mr. Brown, Mr. Sproul, Mr. Doak, and myself. Mr. Brown said the brakeman came through the train and hollered 'Durand,' and he got off, and the train started up and he went to get back on and he fell."

Oliver J. Fleming, conductor on the Grand Trunk, testified:

"I was down where Mr. Brown was picked up, and so was Mr. Cook and Mr. Doak and Mr. Sproul. Mr. Brown was lying on the outside of the track. * * *

"Q. What statement did he make as to how the accident occurred?

"A. He said when the train stopped he thought he was at Durand and got off, and saw where he was, and went to get back on again; that was about all he could remember."

The injury occurred upon Sunday night. After the plaintiff's arm was amputated in Dr. Fair's office, he was taken to the Y. M. C. A. hospital at Durand, where he was treated and cared for until the following Saturday, when he went to the University hospital at Ann Arbor, where he remained for some 18 or 20 days.

The evidence of the defendant tends to show that while at the Y. M. C. A. hospital at Durand the plain-

tiff was visited by the claim agent of the defendant on a number of occasions, and the subject of a settlement was discussed with the plaintiff. It is undisputed that the claim agent stated to the plaintiff, as his opinion, that the defendant was not liable to the plaintiff in any sum according to his own statement, but he offered to settle with him and pay him the sum of $50 and all his hospital expenses. Negotiations were continued for two or three days, the plaintiff refusing to accept $50 and demanding $100 in settlement. Finally, on Friday, August 1, 1913, a settlement was reached with the plaintiff, and the following agreement was signed by him by his mark and witnessed by his son, Allen Brown, Dr. Fair, and the claim agent, the substance of which is as follows:

"In consideration of one hundred dollars and hospital services and doctor's bills for a period not exceeding (3) three weeks to me paid by Ann Arbor Railroad Company, the receipt of which is hereby acknowledged, I hereby release and discharge the said Ann Arbor Railroad Company from any and all liability for and on account of any claim I have, or may have, against said railroad company by reason of, or in any manner growing out of personal injuries received when I jumped off of an excursion train 1881 feet south of diamond or crossing of Ann Arbor R. R. Co. and Grand Trunk Crossing, and received injuries to right arm and same was amputated, right knee, left hand and right side of abdomen contused and lacerated near Durand, State of Michigan, on or about the twenty-seventh day of July, A. D. 1913, said payment being received in full satisfaction of all claims of whatsoever nature to date.

"And I also agree that this release shall operate as a bar to any and every suit at law or otherwise, which I or my heirs, executors, administrators, or personal representatives otherwise might or could sustain by reason of the claim aforesaid."

It further appears that, after the plaintiff had been

in the hospital at Ann Arbor for about a week, he received the check of the defendant, at the hands of the said claim agent, for the sum of $100, attached to which was a voucher purporting to be in full settlement and satisfaction of any and all claims substantially as stated in the foregoing instrument. This voucher purported to be signed by the mark of the plaintiff in the presence of two witnesses, one of whom was sworn as a witness and testified to her own signature, but had no recollection of the transaction other than the fact that the plaintiff received $100 by the check of the defendant, which was placed to his credit together with $29, the amount of the hospital bill.

While the testimony on behalf of the defendant tends to show that the foregoing claimed release was given and settlement made with the plaintiff at a time when he was fully competent and understood the entire transaction, the plaintiff testified that he had no recollection whatever of the claimed settlement at Durand, but did admit that he received the sum of $100 from the defendant while in hospital at Ann Arbor, claiming that it was given to him by the defendant because of sympathy with him in connection with his injury, and that the same was so offered and received as a gratuity; that he had never tendered or paid back the same; that he had no knowledge of giving or executing any release until such claim was made after the commencement of this suit; and that he never had agreed to release any claim which he might have against the defendant. This question was submitted to the jury by the trial court.

On rebuttal the following hypothetical question was asked of Dr. Belser, and the following occurred:

"*Q.* Suppose a man of the age of 63 years in some manner getting off or on a passenger train fell so far under the wheels of the train that his arm was crush-

ed in such a manner above the elbow that the arm was removed, and had lost a lot of blood, and during the operation there was administered to him 1½ ounces of chloroform, two 1/60 grains of strychnine, some digitalis and ¼ grain of morphine after the operation, on the next day ⅛ grain hypodermic injection of morphine and in the mouth some ⅛ grain tablets of morphine, on the next day one ⅛ grain hypodermic injection of morphine and more tablets of morphine of ⅛ grain size, on the next day, Wednesday, three ⅛ grains hypodermic injection of morphine and more morphine tablets of ⅛ grain, and on Thursday, the next day, one hypodermic injection of morphine and more morphine tablets, would he be, or would he not be, able to legally comprehend what he was doing on Friday, the next morning?

"*Defendant's Attorney:* I object because it does not state with any degree of certainty the treatment or method in which the morphine was administered or the anæsthetic given to him.

"*The Court:* Does the number of tablets given appear?

"*Plaintiff's Attorney:* It does not, from the testimony.

"*Defendant's Attorney:* I object further that the question is not based on the evidence.

"Q. As to the morphine that was administered through the mouth, I understand the testimony to be that it was administered to him through the mouth in tablet form consisting of ⅛ grain, when it was necessary to quiet him?

"*The Court:* I think he may answer the question. (Exception for defendant.)

"Q. Would he be able to legally comprehend what he was doing on Friday morning?

"A. Well, I think his mind would be in rather a depressed and blank condition; I don't think he would be in a very bright condition.

"*Defendant's Attorney:* I move the answer be stricken out, what he thinks about it.

"*The Court:* Go on. I deny the motion. (Exception for defendant.)

"Q. You may state whether or not a shock such as

you say would follow and the drugs which were administered would or would not affect a person's mental faculties so he might be caused to do certain things and· not know it, and the whole week things be done of which he would not remember anything?

"*Defendant's Attorney:* I object, that does not conform to the testimony.

"*The Court:* Answer. (Exception for defendant.)

"*A.* I think that could happen.

"*Defendant's Attorney:* I move the answer be stricken out as a mere opinion. (Motion denied. Exception for defendant.)"

At the close of the testimony, the defendant asked for a directed verdict on the grounds of a variance between the allegations in the declaration and the testimony of the plaintiff. Also because of the settlement, and the release of the plaintiff, which motion was denied and exception taken. The trial resulted in a verdict and judgment for the plaintiff in the sum of $2,000. There was a motion for a new trial, which motion presented nearly every question raised in the case, and the further reason that the judgment was contrary to the law and the evidence in said cause, and contrary to and against the weight of the evidence. The motion was denied in writing, to which denial exception was duly taken. The case is before us on writ of error.

The questions raised by appellant by appropriate assignments of error and discussed in the brief and at the oral argument may be summarized as follows:

(1) Is the verdict against the weight of the evidence as regards the manner in which the accident took place?

(2) Is the verdict against the weight of the evidence in regard to the release, and was the circuit judge in error in overruling defendant's motion to direct a verdict because plaintiff had released the defendant company from liability?

(3) Did the court err in overruling defendant's

objection to the hypothetical question propounded by counsel for plaintiff, above set forth?

1. We have read this record with great care and are impressed with the claim of the appellant that the verdict is against the great weight of the evidence as regards the manner in which the accident occurred. The plaintiff's testimony, at the trial, that the jerking of the train threw him off, is equivocal and vague and is flatly contradicted by his own admissions on several occasions shortly after the accident, as testified to by seven witnesses, one of whom was the plaintiff's own witness, and only one of whom (Dr. Fair) was in any way connected with the defendant company. Defendant requested the court to charge the jury as follows:

"If you find from the evidence that the plaintiff got off the train of the defendant, and attempted to board the train again after the same was in motion, and in so doing was thrown under the wheels of the train and was injured, then he would be guilty of contributory negligence, and your verdict should be no cause of action."

This request to charge was not given, nor was the substance of it given; although the jury were instructed that if they found that the plaintiff was not injured as claimed in his declaration, by attempting to get off the train, he could not recover.

If the statements previously made by the plaintiff as testified to by the numerous witnesses be believed, then the injury was clearly due to the plaintiff's own negligence in attempting to get on a moving train, and he could not recover. *Blair* v. *Railroad Co.*, 60 Mich. 124 (26 N. W. 855) ; *Lake Shore, etc., R. Co.* v. *Bangs,* 47 Mich. 470 (11 N. W. 276) ; *Werbowlsky* v. *Railway Co.*, 86 Mich. 236 (48 N. W. 1097, 24 Am. St. Rep. 120) ; *Jacob* v. *Railroad Co.*, 105 Mich. 450 (63 N. W. 502).

While the mere number of witnesses contradicting

plaintiff's testimony is not conclusive, yet it is a fact which should not be lost sight of. In our opinion the motion for a new trial should have been granted on the ground that the verdict was against the great weight of the evidence, as to the manner in which the accident occurred, and that it was error to refuse the same. *In re McIntyre's Estate*, 160 Mich. 117 (125 N. W. 51).

2. We hesitate to hold that the verdict is against the overwhelming weight of the evidence in regard to the release. There is some testimony in the record that the claim agent, in his conversation with the plaintiff, sought to impress upon the plaintiff that there was no liability on the part of the company, and that everything he gave him was a matter of charity and a gratuity. Upon this subject the claim agent testified on cross-examination as follows:

"* * * I wanted to impress upon Mr. Brown that I wanted to be perfectly fair with him, and I told him every time I talked with him about the settlement that there was no liability on the part of the company, and that everything I gave him was a matter of charity, and I wanted him to believe it was a matter of charity. * * *

"Q. And all your talks all the time with Mr. Brown was that whatever you gave him was a matter of charity?

"A. It was nothing else. There was no liability.

"Q. You wanted him to believe it?

"A. When I told him; yes, sir."

There are decisions to the effect that a payment back, or tender, is unnecessary where the money was paid voluntarily or as a donation, and the plaintiff subsequently induced by fraudulent means to execute a paper which turned out to be a release. Likewise, it has been held that, where the amount received was not understood by either party to be in settlement of the disputed liability, a return or tender of the money

was not necessary. *Simeoli* v. *Rubber Co.*, 81 Conn. 423 (71 Atl. 546) ; *Mensforth* v. *Brass Co.*, 142 Wis. 546 (126 N. W. 41, 512, 135 Am. St. Rep. 1084). See *Marple* v. *Railroad Co.*, 115 Minn. 262 (132 N. W. 333, reported with note in Ann. Cas. 1912D, 1084 *et seq.*).

The testimony of the plaintiff is very positive to the effect that he never knowingly signed, or authorized the signing of, any release. While the testimony opposed to this position of the plaintiff is very persuasive, yet we do not feel like holding, as matter of law, that there should have been an instructed verdict upon the subject of the claimed release.

3. We are of the opinion that the court erred in permitting the hypothetical question to be answered, for the reason that there was no sufficient foundation in the evidence upon which to base such question; and we think there was prejudicial error in the overruling of defendant's objection to this question. A careful reading of the record shows that there was no positive testimony as to the treatment of the plaintiff. In other words, as objected to by counsel, what the treatment consisted of did not appear with any certainty. The question purports to lay before the witness such facts regarding the administration of certain drugs and opiates during plaintiff's confinement at the hospital at Durand as would enable the witness to give an opinion as to whether or not the plaintiff would be able to comprehend what he was doing on Friday. The foundation was wholly uncertain. The number of morphine tablets administered was not given at all. The question refers to "some" digitalis; "some" ⅛ grain tablets of morphine; "more" tablets of morphine; again "more" morphine tablets; and still again "more" morphine tablets. The question did not state at what time of the day the hypodermic injections

were given, and it seems to us that it wholly lacks that degree of certainty which makes the answer of the expert admissible, or of any value. The record shows that the plaintiff's attorney admitted that the number of tablets did not appear in the testimony, yet he sought to have the witness testify what would be the condition of a patient on a given day if on the preceding days an indefinite unknown quantity of drugs was administered to him at unknown intervals. This court said, in *Turner* v. *Township of Ridgeway,* 105 Mich. 409 (63 N. W. 406):

"As the question was put, it would be impossible for any expert to give an intelligent answer as to whether a fall upon the side would occasion concussion of the spine. It would depend, of course, upon the nature of the fall."

And so here, it would depend upon the number of tablets of morphine administered, the method of administering, and the time when the doses were given in order to determine the effect upon the patient. Such question and answer were well calculated to mislead the jury.

This court has recently, in the case of *Beattie* v. *J. L. Hudson Co.,* 180 Mich. 111 (146 N. W. 650), had occasion to pass upon a similar question. In that case Justice BROOKE, speaking for the court, said:

"We think it obvious that an opinion based upon facts or information beyond the personal knowledge of the witness, and not in evidence, should not have been permitted to stand. *Connell* v. *McNett,* 109 Mich. 329 [67 N. W. 344], and *La Londe* v. *Traction Co.,* 145 Mich. 77 [108 N. W. 365]."

In our opinion the testimony of this physician was probably largely influential upon, and may have controlled the verdict of the jury as against the numerous witnesses who testified that plaintiff's condition was

in fact that of one competent to execute the release in question.

For the errors pointed out, the judgment of the court below is reversed, and a new trial granted.

OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred. MCALVAY, C. J., and BROOKE and KUHN, JJ., concurred in the result.