## J. Addison Lawyer and others v. Henry Smith.

Where a subscribing witness to a will was called to prove it upwards of thirty years after its date, and testified that he signed it as a witness, but that he had no distinct recollection of seeing the testatrix sign it: *Held* that questions to him whether, looking at the attestation clause, he had any doubt she signed it in his presence, and whether he ever witnessed an instrument in that form without knowing what it was, and whether he had any doubt that the persons whose names were to it were present at the time of its execution, were not incompetent, and that it was for the jury to give such weight to his evidence in answer thereto as they might think it entitled to under all the circumstances of the case.

LAWYER *v.* SMITH.

After the death of the testatrix, a will twenty five years old was discovered, in a barrel among waste papers, and either torn or worn into several pieces, which were scattered loose among the papers in the barrel. Whether the injury to the instrument was done by the testatrix or by some other person, and if by her, whether accidentally, or intentionally and for the purpose of revoking the will, are questions of fact for the jury; and to aid them in determining these questions, and not as separate and independent evidence of a revocation, the declarations of the testatrix, made after the date of the will, that she had destroyed it, are competent evidence.

A legatee in a will is neither a party to the probate proceeding, nor one "in whose immediate and individual behalf" the proceedings are wholly or in part had, within the meaning of the statute; and is therefore a competent witness to sustain the will.

*Heard April 17th, 18th & 19th. Decided July 9th.*

Error to Washtenaw Circuit.

On November 17th, 1856, the defendant in error presented to the Probate Court of Washtenaw county, for probate ₆and allowance, an instrument purporting to be the last will and testament of Gertrude or Gitty Fletcher, the wife of William A. Fletcher, bearing date June 11th, 1824, and made under an ante-nuptial agreement with her husband, of the date of November 28th, 1820. By this will, the testatrix bequeathed her personal estate to Peter Mann, Jacob Williams, and Isaac Hall Tiffany, upon trust within one year after her decease, provided her son John Tiffany should then be of age, and if not, then when he should reach the age of twenty, to pay and deliver the same to said John Tiffany, excepting a small legacy to her husband. But if said John should die without lawful issue, then said trustees were directed to pay and deliver one moiety of said personal estate to her niece Lovina Armstrong, and to divide the other moiety equally between said Lovina, and five other relatives who were designated, whenever they should respectively arrive at the age of twenty-one. And the said trustees were made executors of the will.

R. W. Nolton, Nelson Hempstead and John K. Starrin, were the subscribing witnesses to the will; it was signed by the testatrix at the end, and the following is the attestation clause: "Signed, sealed, published and declared, by the above named Gertrude Fletcher, to be her last will and

testament, in presence of us, who have hereunto subscribed our names as witnesses in the presence of the testatrix."

On the hearing in the Probate Court, the plaintiffs in error appeared and opposed the allowance of the will, and the same having been admitted to probate, they appealed to the Circuit Court, where trial was had by jury, and the following among other evidence given :

Nelson Hempstead, testified that he knew Gitty Fletcher in her life time. " She resided in Esperance, N. Y. I can't tell the precise number of years she lived in Esperance, but she lived here several years. I became acquainted with her soon after she came here. I was acquainted with her till she left. I knew R. W. Nolton, and John K. Starrin : both resided here while she lived here. My name to the attestation clause is genuine. I am positive that Nolton's name is genuine. I am not so well acquainted with Starrin's hand writing : I have seen him write."

" When I put my name to the paper, Mrs. Fletcher (Gitty Fletcher), R. W. Nolton and Judge Tiffany were present, and John K. Starrin. It was done at Judge Tiffany's office, in the village of Esperance, according to the best of my recollection. My impression is that it was during the time Mrs. Fletcher resided in this village. I don't know as I recollect who called me in. I think Nolton and Starrin put their names to the paper at the same time, and I think the several persons I named before were all present at that time. My impression is that Mrs. Gitty Fletcher at the same time signed her name. I don't know whether she signed her name before or after the witnesses did. I was called in as a witness. My impression is that it was represented to us that it was her will. I don't know what her age was at that time. I should judge she was about thirty years old. She appeared to know what she was about, as far as I know. A part of the time while she lived here she kept a tavern where Mr. Morris now does. She kept boarders. She managed her business herself, according to my

recollection. She did so with considerable tact and ability. I have conversed with her, and have heard her converse with others, on different occasions. She seemed to understand what she was talking about when I heard her converse with myself or others. When that paper was signed, she was in the enjoyment of her reason as perfectly as at any time while I knew her, at least. That is my impression. She was then capable of knowing the condition and extent of her property."

John K. Starrin, testified:

"I placed my name to that instrument (the will) where the same now appears.

Question: Did you see the will signed by Gitty Fletcher where her name now appears?

Answer: It is impossible for me to say. I have no distinct recollection.

Question: Look at the attestation clause of the will, and at your signature, and then state whether you have any doubt that Gitty Fletcher signed that will in your presence.

Objected to, as calling for the opinion and conclusion of the witness as to her signature; but the court overruled the objection.

Answer: I have not any doubt she signed it. I have no recollection that it was stated to me at the time what this paper was.

Question: Did you ever witness an instrument in the form you have there without knowing what it was?

Objected to, as irrelevant, incompetent and immaterial, but the objection overruled.

Answer: No sir.

Question: Have you any doubt that all the persons whose names appear to this will were present at the time it was executed?

Objected to, but the objection overruled and the witness answered — No sir."

Robert W. Nolton, testified:

"I subscribed that will. I think my name appears where I placed it. I can't tell whether I saw Gitty Fletcher sign it. I have no recollection upon that subject.

Question: Look at the attestation clause and your signature to the will, and state whether you have any doubt as to having seen the testatrix sign the will.

Answer: I can't answer that question.

Question: Do you think that, at the time you signed this will, you knew what you were signing?

Answer, under objection: There is great probability that I did. I can't recollect any of the circumstances attending the execution of the will."

William S. Maynard, testified in substance as follows: "I first knew Gitty Fletcher in Ann Arbor. She came here 14 or 16 years ago: resided in the town of Ann Arbor. I was her guardian: I was appointed by the Judge of Probate of Washtenaw county six or eight years ago. She was removed from this state by John Feeck to his mother's in the state of New York. She afterwards returned to Michigan, and was taken to Brattleboro, Vermont, by me, to the Lunatic Asylum, and there detained by reason of her insanity. I know nothing of her death except by information by letter. I sent money to the superintendent of the Lunatic Asylum to pay her expenses there, as he requested. Sent him money to pay her funeral expenses since. I have not heard of her existence since."

John Tiffany, it appeared from the testimony, died in 1830.

The contestants, on their part, introduced the deposition of John Feeck, which was substantially as follows:

"I first saw the will in 1849, at Ann Arbor. There are some alterations in it. It is wafered up, and tape stuck in at the side, and I did not see that seal opposite the name of Gitty Fletcher there at that time, and I am quite positive there was no seal upon it at all. My strong impression is there was no seal. I first knew William

A. Fletcher in Michigan in 1849. He died some two or three years after I first became acquainted with him."

The following, being a portion of the witness' answer to one interrogatory, was objected to by the appellee, and was ruled out by the court. "I have heard her (Gitty) say she had destroyed her old will, and was going to make a new one. I heard her say this first about the year 1841 or 1842. Then I heard her say it again the first time I went to Michigan in 1848."

The witness further said: "I went to Michigan again in 1849, and I fetched her and her effects along back with me to Schoharie; her clothing, bedding, and so on."

The following, being a portion of said witness' answer to an interrogatory, was also ruled out by the court. "I questioned her again, at that time, concerning her will. I was anxious to know something about it. She gave me the same answer as before, that she had destroyed her old will, and was going to make a new one."

The witness further said: "After I brought Gitty to Schoharie and left her with my mother, I went back to Michigan, and got consent of William S. Maynard, her guardian, to examine her papers. I searched for papers, and expected to find a will. I looked for papers in Mr. Maynard's house, in his store, and in a building near by his store; and in a barrel amongst a lot of waste paper, newspapers, pamphlets, and some old letters, I found the will. It was separated at the top, and was in a number of pieces; and the different pieces were scattered loose among the papers in the barrel. Some of the half sheets were separated in two pieces, and the last half with the signature was in three pieces. I gathered them up together, matched them so that I could tell how it read, fastened them at the top, and put them up, and kept them in my house a little over five years — five years and a half about — and then delivered the will to Dr. Joel Foster of the city of New York. The piece was torn,

out at the top of the will at the time I found it in the barrel, as it appears now."

To the cross interrogatory on the part of the appellee the witness said:

"The paper was the same when I delivered it to Dr. Foster with the exception of the seal. The tape and the wafers where the sheets are torn apart are as when I found it. I can state there was no alteration made of the seal at the right hand of the signature of Gitty Fletcher, after I found the paper, and before it was delivered to Dr. Foster. I also delivered to Dr. Foster an ante-nuptial contract between William A. Fletcher and Gitty, which I also found in the barrel. I will not be positive whether two of the half sheets of the will stuck together when I found the papers."

Daniel F. Allmendinger, a witness for contestants, testified:

"I was in Ann Arbor in 1826; moved here in 1830, and have lived here ever since. Knew Mrs. Fletcher; became acquainted with her in 1833 or 4, and did business for her. She frequently applied to me to do business for her; when she had fifty or a hundred dollars she would come to me to dispose of it. I have written a great many letters for her; perhaps twenty, thirty or more. I never knew her to write. I wrote the letters at her request. She had the greatest confidence in me. After John died, she had $200 in specie, with other things, sent her from New York in a box. Once she brought all her papers to me to examine them. I did examine them. I knew the amount of her estate within ten dollars. I frequently saw her papers, but never saw any will among them. She told me she had destroyed her will." To this last statement of the witness as to the destroying of the will objection was taken, and the court struck the evidence out.

"This conversation about destroying the will occurred more than once, and it was between 1835 and 1840. It was after the death of her son John."

The counsel for contestants then put the following question to the witness:

Did she (Mrs. Fletcher) speak of making any disposition of her property—if so, what—in any of the conversations with you: If so, what did she say? Which question was objected to; and the objection sustained.

The witness further stated:

"She always complained of the death of her son. She would say, Oh, if my young one was only alive. She knew her son John was dead previous to 1836. I wanted a penknife that had belonged to John, and she would not let me have it. She always dictated the letters I wrote for her"

A letter was then produced, which the witness testified to having written at her dictation, dated Ann Arbor, March 28, 1844, directed I. H. Tiffany, and mailed to him by the witness, in which, among other things, she says: "My old will is destroyed, and I want you to make me a new one." This letter the contestants offered to read in evidence, or at least that portion thereof in reference to the destruction of her will; but objection being made, the court excluded it.

The witness further stated:

"Her valuable papers she always carried with her, and they were wrapped up and put in a basket, and she carried the basket wherever she went. She brought them to my home more than a hundred times, and during all my examinations I never saw a will among them. I examined her papers one, two, or three times a year, wholly or partially, up to 1840. I never found a will, or any thing purporting to be a will, among them."

On his cross examination, he said that he only once made an extensive examination of her papers. "I examined all she produced. She might have had others. There were notes, bonds, mortgages, contracts and papers about her matters. There was a paper something about her

trustees. She had told me about that. I told her the contents of the papers just as it was. She took the papers and put them away. I presume she put them in her basket. She carried her documents with her — all her important papers."

Thomas C. Cutler, a witness for contestants, testified:

"I lived in Ann Arbor since July, 1840. Knew Mrs. Fletcher. I was one of the appraisers appointed by the Judge of Probate to make inventory and appraisal of her property after Maynard was appointed her guardian. She was present when we commenced. She became so boisterous she was taken away to jail. We searched through her papers and effects to see if there was valuable papers. Most of which we opened were. Letters were found there in different places; some in drawers, chests, boxes, and barrels, and in a barrel there were newspapers of every description. Some things packed away very improperly; in one place found with the papers a crock of rancid butter; and all papers we thought of consequence we took to Maynard's, to the wooden building, and he took charge of them. This was in 1849 or 1850. The examination of her property and the inventory were made at the dwelling house she had occupied for many years. John Feeck was present all the time, and was there alone some of the time. She had been deranged for some time, and lived there alone."

On his cross examination he said, he found the papers scattered and mixed promiscuously with other things. No one place in particular for any thing. In the middle of a chest packed with bed clothes, we found some some money tied up. "If I had noticed a will I should have taken care of it. As far as I made an examination it was thorough. I do not know how Fletcher and Feeck did; what they looked over I did not. I did not examine half the papers."

On his re-examination he said "the money found in

the chest was $150, $160 or $170. Maynard took all the papers that were considered valuable from Mrs. Fletcher's hands when she was leaving. They were all together tied up in a rag, and in a basket. They were inventoried a week after. We found no papers of any value outside of that bundle that we inventoried. I speak of money securities, notes, &c."

William S. Maynard, testified:

"I don't recollect where the money securities were found. I know I took the basket from Mrs. Fletcher, and handed it over to Cutler. She kept the basket about her person. There were silver spoons in it. I did not personally make much search for valuables, but my impressions are that all her valuables were in the basket I did not search the other things. All else was badly strewn around. I left them with the others. I looked over the papers afterwards at my place: saw correspondence with Tiffany, Fletcher, Eacker and others, after John Feeck came here and asked to examine the papers. He took Mrs. Fletcher east at my request, and returned. I gave him permission to look at the papers in the barrel in my old store, and he did. Mr. Morgan was one of the appraisers, to whom I delivered the basket with the valuable papers. E. T. Williams, was another of the appraisers. Mr. Cutler, I think, done most of the work. I found nothing that purported to be a will."

On his cross-examination he said: "I had looked at the papers before Feeck came back. Examined them, but not very closely. The papers were carried up stairs in a shawl. Carried some into the parlor, and looked at them myself. Left them with Feeck. I did not know that Feeck took away any of the papers. I let him have a mortgage which he said belonged to his mother. Feeck never asked me to let him take away any papers."

On his re-examination he said, "the papers that were examined in the parlor were the mortgages, notes, &c.

of value, belonging to Mrs. Fletcher. Feeck had permission to examine every thing in the old store. It was only of value as waste paper, as it was old trash."

Considerable other evidence was offered by contestants of statements made by the testatrix, relative to the destruction of her will, and to some contemplated disposition of her property; and also certain letters, proved to be from her, bearing dates from 1839 to 1846, all of which had relation to her property, and tended to show what disposition she proposed to make of it since the death of her son; all of which were excluded by the court.

The appellee also called John Foster, who had married Lovina Armstrong, the principal legatee; who was permitted to be sworn and to give material evidence, under an objection by the contestants to his competency.

It was made a question on the trial, whether the domicil of the testatrix was in New York or Michigan, at the time of the execution of the will; but this becomes immaterial under the view taken by the court.

The jury having returned a verdict sustaining the will, the contestants brought error.

*O. Hawkins*, and *C. I. Walker*, for plaintiff in error:

To the point that the court erred in excluding the declarations and letters of the testatrix as bearing on her intention to revoke, they cited: — 2 *Yeates*, 170; 2 *Dall.* 266; 3 *Curteis*, 626; 1 *Curteis*, 581; *Ibid.* 505; 1 *Phill.* 461; 2 *Wm. Black.* 1043; 6 *Ad. & E.* 209; 2 *Hagg.* 266; 4 *S. & R.* 297; 2 *Bradf.* 281; 1 *How.* (*Miss.*) 336; 1 *Ala.* 474; 1 *Jarm. on Wills*, 159, *note* 1. That the will being found among waste papers, the legal presumption is that it was rightfully there, and that the testatrix intended to cancel the same; and this legal presumption stands good until rebutted by proof: — 2 *Barr*, 110; 11 *Vt.* 125; 14 *Ala.* 474; 2 *Rich.* 184; 2 *Dall.* 286; 6 *Wend.* 173.

LAWYER v. SMITH.

*Henry Smith*, (*of Albany, N. Y.*), for defendant in error:

The manner in which a will may be revoked is prescribed by statute, and where it is claimed that the will has been revoked by some act of the testator *amino re-vocandi*, declarations are inadmissible to show the *animus* unless a part of the *res gestæ:* — 1 *Kern.* 157; 4 *Cow.* 483; 6 *Cow.* 377; 2 *Johns.* 31; 1 *Gall.* 170; 5 *Bing.* 435.

The declarations offered (and the letters are no higher evidence than oral statements) were not a part of the *res gestæ.* Declarations, to become a part of the *res gestæ*, must have been made *at the time of the act done*, which they are supposed to characterize; and have been well calculated to unfold the nature and quality of the facts they were intended to explain, and so to harmonize with them as obviously *to constitute one transaction:* — 3 *Conn.* 250; 9 *Paige*, 611, 617; 1 *Greenl. Ev.* § 108.

There is nothing in the pretence urged on the trial that the facts proved warranted the inference that the testatrix produced that condition of the will in which it appeared, and that in the absence of direct testimony as to how this condition was produced, the same could be proved by her declarations. This would allow them to show both the act of destruction, and the *animus*, by declarations; when by law they can not even prove declarations to show the *animus*. And such a rule would entirely annul the statute, and allow a revocation of a will to be established by mere declarations, without any proof of *the act* of cancellation or destruction.

No violence to the will amounts of itself to a revocation; and when (as in this case) the person's will was found in a smeared and lacerated condition, and the evidence shows that when the will was found the testator was of unsound mind, no inference against the will, or in favor of a revocation, arises. Wills found under circumstances much more unfavorable than this, have been established: — 1 *Phill.* 71; 7 *Johns.* 394; 11 *Wend.* 227.

Manning J.:

The will was made and executed in the state of New York; but it is of no importance whether it was executed there or in Michigan, or whether the testatrix at the time was a resident of New York or Michigan, as the law of each state was complied with in its execution. Nor was there any error in admitting the depositions of Nolton, Hempstead, and Starrin, the witnesses to the will, to go to the jury as evidence of its execution and publication by the testatrix. It could not be expected, after the lapse of thirty years, they should recollect all the particulars attending the execution. It was for the jury to give such weight to their evidence as they might think it entitled to, under all the circumstances of the case.

But the judge erred, we think, in refusing to receive evidence of the declarations of the testatrix that she had destroyed her will, and in not admitting a letter of hers, stating her will was destroyed. Such evidence is not admissible as proof in itself of a revocation, for the statute provides, "no will, nor any part thereof, shall be revoked unless by burning, tearing, cancelling or obliterating the same, with the intention of revoking it, by the testator, or by some person in his presence and by his direction;" "or by some other will, codicil or other writing executed in the manner provided for the execution of a will:" — *Comp. L.* § 2833. The first we hear of the will after its execution in 1824, is the finding of it by Feeck in 1849, "in a barrel among a lot of waste paper, newspapers, pamphlets, and some old letters." He says, "it was separated at the top, and was in a number of pieces, and the different pieces were scattered loose among the papers in the barrel." It consisted of a number of half sheets of paper, some of which were separated in two pieces, and a piece was torn out at the top. He gathered them up, matched them, and fastened them at the top, and kept them in his possession five and a half years. A will found as this was, in a barrel among old

letters and other papers of no account, and in the mutilated condition stated, needs some explanation of these circumstances to admit it to probate. The piece torn out at the top and the separation of the half sheets can not be accounted for by the age of the instrument. They are evidence of violence, or an intentional injury to the instrument; but whether done by the testatrix or some other person; and if done by her, whether accidentally, or intentionally and for the purpose of revoking her will, were questions of fact to be determined by the jury. To aid them in arriving at a correct conclusion on these points, and not as separate and independent evidence of a revocation, we think the declarations of the testatrix should have been permitted to go to the jury, for what they were worth, under all the circumstances. See opinion of Chancellor Walworth, in *Betts v. Jackson,* 6 *Wend.* 173.

Foster was a competent witness for the will. Neither he or his wife, who is a legatee, is a party to the suit. His wife was interested in the matter in question, or in the event of the suit. But that is no disqualification under the statute, unless the suit is prosecuted "wholly or in part, in the immediate and undivided behalf" of his wife. In *Freeman v. Spalding,* 2 *Kern.* 372, it was held, under a like statute, that a residuary legatee was a competent witness for the executor, in a suit brought to recover a debt due the estate: — *Bank v. Palmer,* 2 *Sand.* 686; *Hart, Admr. v. Stephens,* 6 *Q. B.* 937; *Hill v. Kitching,* 3 *M. G. & S.* 299.

Judgment reversed and a new trial granted.

The other Justices concurred.