*In re* FOERSTER'S ESTATE.

GUMTOW *v.* JANKE.

1. WILLS—PRESUMPTIONS—REVOCATION—LOSS.

The presumption that testator revoked his will, from not finding the instrument or from finding it mutilated, is not overcome by proof that persons who would be injuriously affected by it had opportunities to destroy or mutilate it; but if other suspicious circumstances exist the presence of motive for its destruction may sustain a finding that the will was unlawfully destroyed.

2. SAME—TRIAL—FINDINGS.

On the trial of a will contest, findings, in answer to special questions submitted to the jury, that decedent executed the will proposed for probate, were conclusive on the contestant who submitted the questions.

3. SAME—EVIDENCE.

Upon considering all the testimony in relation to competency of the testator, undue influence, and due execution of the will, it is *held*, that there was no competent evidence of undue influence but the other questions were for the jury.

4. SAME—ADMISSIONS—REVOCATION, PROOF OF.

Statements of the testator, made subsequent to the execution of a will, tending to show his purpose to revoke the will, were properly received in evidence, in connection with affirmative testimony that he destroyed it by tearing.

5. SAME.

*Held*, also, that the evidence was insufficient to rebut the presumption that testator had revoked the testament, arising from nonproduction of the instrument, and that the verdict was contrary to the great weight of evidence.

6. SAME—TRIAL—SPECIAL QUESTIONS—JURY.

It was error to submit to the jury a special question as follows: "Did said August Foerster tear or burn said will on August 25th, intending to revoke the same?" The question could not be answered unequivocally and intelligently.

7. SAME—UNDUE INFLUENCE.

Where the contestant, after the death of the testator, presented two petitions to the probate court, stating that the deceased left no will, and she was his only heir, and proponent claimed the statements were fraudulent, and where the contestant, as an explanation, claimed she did not know the instrument in question was a will, that she had signed the petitions without reading them and supposed her brothers and sisters were dead, the facts had no tendency to establish undue influence.

Error to Wayne; Mandell, J. Submitted October 8, 1913. (Docket No. 10.) Decided November 3, 1913.

Emil Gumtow and others presented for probate the last will of August Foerster, deceased. Anna Janke, Marie Remus, and Gustave Foerster contested the allowance of such instrument. From an order denying the petition proponents appealed to the circuit court. Judgment for proponents, contestant Janke brings error. Reversed.

*Arthur H. Covert (Henry B. Graves,* of counsel), for appellant.

*James H. Pound,* for appellees.

STONE, J. This case presents a contest over a petition to probate an alleged lost or destroyed will of August Foerster, deceased. The petition was denied in the probate court of Wayne county, and proponents appealed to the circuit court where the matter was tried before a jury, which found said alleged lost will to be the last will and testament of August Foerster, deceased. The case is brought into this court upon writ of error by Anna Janke, one of the contestants, and sister of the alleged testator. The proponents of the alleged will are Emil Gumtow and Ernest Gumtow, children of a sister of the alleged testator's wife, living on a farm near New Boston, Wayne county, Ernest Krause and John C. Hecker of Detroit, who

are not related to the alleged testator but were friends of his. There are a number of beneficiaries besides the proponents under the alleged will. A copy of the alleged will, found by the jury to be correct, is as follows:

"August Forster (a widower), of the city of Detroit, county of Wayne, State of Michigan, being of lawful age, sound mind and memory, do hereby make, publish and declare the following to be my last will and testament, that is to say:

"1. I hereby revoke any and all wills by me heretofore made, same to be null and void.

"2. I hereby empower and instruct my executor hereinafter named to pay all my lawful debts and funeral expenses as soon as possible after my decease.

"3. I hereby give and bequeath to my sister, Anna Janke, her heirs and assigns, of Detroit, Mich., the sum of five hundred dollars.

"4. I hereby give and bequeath to Maria Rennis, her heirs and assigns, Berlin, Germany, the sum of five hundred dollars.

"5. I hereby give and bequeath to Carl Foster, his heirs and assigns, of Lignitz, Schlesian, Germany, the sum of five hundred dollars.

"6. I hereby give and bequeath to Gustav Foster, of Mecklenburg, Germany, his heirs and assigns, the sum of five hundred dollars.

"7. I hereby give and bequeath to Ernst Krause, his heirs and assigns, of Detroit, Mich., the sum of four hundred dollars.

"8. I hereby give and bequeath to the Arbeiter Society No. 1, of Detroit, Mich. (incorporated), the sum of five hundred dollars.

"9. I hereby give and bequeath to Leo Kemp, M. D., his heirs and assigns, of Ypsilanti, Mich., the sum of two hundred dollars.

"10. I hereby give and bequeath to John Hacker, his heirs and assigns, of Detroit, Mich., the sum of one hundred and fifty dollars.

"11. I hereby give and bequeath to Emilie Gumtow, his heirs and assigns, of New Boston, Mich., the sum of two hundred dollars.

"12. I hereby give and bequeath to Bertha Krech-

low, her heirs and assigns, of Ann Arbor, Mich., the sum of two hundred dollars.

"13. I hereby give and bequeath to Emma Baisch, her heirs and assigns, of Ann Arbor, Mich., the sum of five hundred dollars.

"14. All my wearing apparel I hereby give and bequeath to Carl Gumtow, of New Boston, Mich.

"15. All the residue of my household goods and furniture of every description, I hereby give and bequeath to Emil Gumtow and Ernst Gumtow, of New Boston, Mich., to be divided between them as they mutually agree.

"16. All the residue of my estate, real, personal and mixed, of whatever description of which I may be possessed at the time of my decease, I hereby give, bequeath and devise unto Ernst Gumtow and Emil Gumtow, their heirs and assigns, of New Boston, Michigan, share and share alike, and I hereby charge my above estate with the payment of the above stated legacies.

"17. I hereby appoint and nominate Emil Gumtow of New Boston, Mich., executor of this my last will and testament with full power of sale any and all of my estate whatsoever and at such price as he shall see just and fit.

"In witness whereof I have hereunto set my hand and seal this 19th day of August, 1910.

"AUGUST FORSTER.

"The above instrument was at the date hereof signed and declared by the testator as and for his last will and testament, testator signing in our presence and we, at his request and in his presence and in the presence of each of us, have signed our names hereto as attesting witnesses.

"A. J. HUGLI,
"JOS. KAUFMANN."

The contestants in the circuit court were Anna Janke, at whose house August Foerster died and where he lived for nearly a year and a half after his wife died, Marie Foerster Remus and Gustave Foerster, a sister and brother of deceased, living in Germany. Anna Janke is the wife of Herman Janke.

August Foerster, the alleged testator, died September 6, 1910, at the home of his sister, Anna Janke, and her husband, at 744 Jos. Campau avenue, in the city of Detroit. Mr. Foerster came to this country from Germany about 25 years ago, and, after living in Toledo for a while, came to Detroit, where he lived for many years up to the time of his death. His business was that of weaving willow baskets by hand and making baby carriages in a small way, and he and his wife also kept a small candy store for many years on Gratiot avenue. He had accumulated some property, and at the time of his death owned four houses and lots in the city of Detroit, valued at about $8,000, life insurance amounting to $600, and less than $50 in a bank. He had no children and no blood relatives in this country, except his sister, Anna Janke, the contestant.

"Mr. Foerster's wife died January 16, 1909, at his own home on Sherman street, in Detroit; and soon after his wife's death he began to take his meals and to stay overnight part of the time at the home of his sister, Anna Janke; and about the middle of April, 1909, he moved over to the house of his sister, where he lived up to the time of his death, except when in the hospital on two occasions for a few days each. During all the time that Mr. Foerster was living at the house of contestant he was in poor health, and much of the time under a physician's care, suffering from Bright's disease and hardening of the liver. He grew worse and suffered from a dropsical condition and had to be tapped several times. The alleged will was executed August 19, 1910, at St. Mary's Hospital. The next day Dr. Heugle (or Hugli) tapped Mr. Foerster and removed about one quart of fluid serum. This dropsical condition extended over his whole body. During all the time that Mr. Foerster was living at his sister's house she nursed him and cared for him. He first went to Harper Hospital for a short time in May,

1910. On the last occasion he was in St. Mary's Hospital from August 17 to August 23, 1910. On the last-named day he was taken back to the home of the contestant, where he remained until his death. He was 58 years old when he died.

At the time the alleged will was drawn in St. Mary's Hospital, Mr. Foerster also executed a general power of attorney to Mr. Kaufmann, the attorney who drafted the alleged will. This power of attorney authorized Mr. Kaufmann to mortgage any and all property then owned or thereafter to be owned by said Foerster and to deal generally with any of his property as he himself might do. Mr. Foerster then also signed a notice to Herman Janke and Anna Janke that he had appointed Mr. Kaufmann as his attorney to demand and collect all property of said Foerster, including household goods and wearing apparel, at their premises in Detroit. This notice was served on Anna Janke August 20th, but she refused to turn over any of Foerster's belongings to Kaufmann on this demand, saying that she could not tell what her services for Foerster's care were worth; that she would have to consult somebody else who knew what to charge for such services. It was conceded that she had been paid $5 a week by Foerster.

On the morning of August 23d Mrs. Janke called at Kaufmann's office and he went with her to St. Mary's Hospital, where Foerster then was. She complained that Foerster was not taken care of at the hospital, and that he would have to come home with her. That same day, in the afternoon, Kaufmann was in St. Mary's Hospital alone with Foerster, and the latter told Kaufmann that he should leave the furniture with his sister, Anna Janke, and he instructed Kaufmann to draft a codicil to the alleged will, saying:

"My sister is not satisfied and you had better draft a codicil; she will not tell what I owe her, and she makes some kind of a claim; and in order to save liti-

gation you had better draft a codicil and give her $1,000 more."

Kaufmann drafted such a codicil, but it was never signed by Foerster.

On the 25th day of August, two days after Foerster was taken back to the home of his sister, he sent to Kaufmann to bring back his papers, and in the afternoon of that day Kaufmann, with Dr. Heugle, one of the witnesses to the alleged will, went to Mrs. Janke's house, where Foerster then was, and Foerster, in the presence of Anna Janke, the contestant, demanded back the power of attorney from Kaufmann and revoked the power of attorney by writing these words across the face of it:

"DETROIT, Aug. 25/10.
"I hereby revoke the within instrument, the same to have no further effect.
[Signed]  "AUGUST FORSTER."

At the same time the alleged will was given to Foerster, at his request, by Kaufmann, who had had it in his possession from the time of its execution up to that time. When the alleged will was handed back to Foerster by Kaufmann, it was in an envelope, and Foerster receipted for the will. Kaufmann charged $35 for his services. Foerster was not satisfied with this charge, but after some explanation and controversy Foerster finally said to his sister, Anna Janke, "Go and get the money and never mind." She went and got the money and gave it to Kaufmann, who gave a receipt for the same. Foerster then seemed satisfied, and Kaufmann left and never saw Foerster again.

It appeared upon the trial that on June 18, 1910, August Foerster had drawn and signed a holographic will in the German language, which was witnessed by one Dr. George and another witness. Dr. George had been his attending physician at one time. By the terms of this holographic will August Foerster gave

to his sister, Anna Janke, all of his property, except that he made legacies to his nephews Emil and Ernest Gumtow in the sum of $200 each. This paper was handed by Foerster to his sister without stating what it was but with the injunction to keep it with her papers and never give it to any one. Her husband testified that he heard August Foerster call the paper a will. This paper was put in evidence as tending to show decedent's state of mind at the time.

There was evidence on behalf of the proponents tending to show that the contestant Anna Janke had dominated the said August Foerster during his sickness and residence with her, had kept him secluded, and would not allow his friends, and especially the Gumtows, to visit him, and that at times Foerster had complained of the manner in which he was treated by her. All claimed misconduct and undue influence on the part of Anna Janke were denied by her, and she testified that when she kept her brother secluded it was when he was not in a condition to be visited because of his sickness, and that she acted under the advice of the physician. There was much conflicting testimony pro and con upon this branch of the case, and evidence was offered by the contestant Anna Janke, showing numerous statements made by August Foerster that he intended to give his property to her because of her care of him in his sickness.

There is no dispute that the alleged will of August 19, 1910, was delivered to August Foerster, the alleged testator, by Mr. Kaufmann, as above stated, and it was never seen afterwards by any persons, unless it was seen by the contestant Anna Janke and her husband. They both testified positively that, soon after Kaufmann left, the said alleged will was torn up and burned by August Foerster.

Upon that subject Anna Janke testified as follows:

"At that time my husband came in, because he

didn't know anything about this, and he asked Mr. Foerster and said, 'Gus, how do you feel today?' And he says, 'How shall a man feel; here is the last will.' And Mr. Janke says, 'Why, let me see that paper;' and Foerster said, 'No, you cannot see it;' and at that time he tore the last will in pieces; he went then, after he tore the will to pieces, and walked into the kitchen, it was the room next to this one, and I had supper on the stove, and fire in the stove, and he threw the pieces of paper in the stove, the pieces of the will in the stove and burned them up.

"*Q*. Had either you or Mr. Janke read that will?

"*A*. No, we never had a chance to see it. Mr. Foerster didn't tell us what was in it. We didn't have a chance. I didn't see even how the paper looked. I didn't have any chance. Yes, sir; that was the paper that Kaufmann gave him. Yes, sir; that was the will."

Upon this subject Herman Janke testified as follows:

"When I entered the house I saw Mr. Foerster sitting in the chair in the sitting room, sitting at the table, and my wife was there too. He seemed to be feeling all right. He had some papers and was reading in it and I says, 'Well, August, how do you feel?' And he says, 'How should I feel?' He says, 'See here, Herman, Kaufmann was here and brought back the will; he charged me $35 for it;' and I says, 'Let me see it;' and he says, 'No, you don't need to see it;' and he tore it in pieces and walked out in the kitchen and burned it up; and he said, 'Yes, all come running after me and wants my money, and no one would do anything for me for I stunk too much.' His mind was clear on that day. He lived about two weeks, or a week and a half after that, a little over a week and half, lived up to September 6th. He was able to go around the house after that about a week."

The testimony of the witnesses Jacob Squire, Ludwig Schultz, Christie Meiers, and Christine Meiers was to the effect that after the making of the last will, and after he had returned from the hospital, decedent said on different occasions that his sister, the con-

testant, was to have all of his property and gave as a reason that she had taken good care of him in his sickness. The case was submitted to the jury.

The court was requested by said contestant, in her third request, to charge the jury as follows:

"I charge you that there is no evidence of undue influence exercised upon the decedent by Anna Janke, his sister, after his return to her home from St. Mary's Hospital."

This request was refused.

The court, among other things, charged the jury as follows:

"A will is not presumed to be in force because it was once executed, if it cannot be found. If not traced out of the testator's hands, it is presumed to have been revoked by him by destruction. That is true. That is merely the presumption with regard to the nonappearance of a will. There is a presumption of law that where the will is not produced, and it has been destroyed, it was destroyed by the testator. That presumption is a presumption of law, but may be overcome by constant (competent?) evidence."

The following special questions were submitted to the jury by the contestant Anna Janke:

(1) "Did August Foerster execute a will and testament while at St. Mary's Hospital?" This question was answered by the jury "Yes."

(2) "If August Foerster did execute a will while at St. Mary's Hospital, was his mind and memory so weakened by disease, the accumulation of urine, and medicines given to him while there that he did not have sufficient mind and memory to understand what he was doing and his relation to the different beneficiaries?" Answer: "No."

(3) "Were the contents of said alleged lost or destroyed will, if one was made, the same as the copy thereof offered by proponents Gumtow *et al?*" Answered: "Yes."

The following special questions were submitted to the jury by the other contestants:

(1) "Did the deceased, August Foerster, on the 19th day of August, 1910, execute a last will and testament containing the same provisions as the copy offered in evidence by proponents on the trial of this cause?" Answered: "Yes."

(2) "Did said August Foerster then have sufficient mental capacity to understand and execute such a will, and was he free from any undue influence at the time?" Answered: "Yes."

(3) "Did said August Foerster tear or burn said will on August 25th, intending to revoke the same?" Answered: "No."

By appropriate assignments of error the contestant and appellant has, by her counsel, raised and argued the following propositions:

(1) That there was no evidence in the case tending legitimately to overcome the *prima facie* presumption of revocation of the alleged will because of its nonproduction. It is urged that there is in the record much direct and positive evidence that Mr. Foerster was not satisfied with the alleged will after it was drawn, and that there was much direct and positive evidence that the terms of the alleged will were directly opposed to the testator's intentions, as often expressed during the last two years of his life.

(2) That there was no evidence of any undue influence exercised upon decedent by Anna Janke, his sister, after his return to her home from St. Mary's Hospital.

(3) That the verdict was clearly against the great weight of the evidence.

1. It is the claim of appellant that a verdict should have been directed for the contestant, and her counsel quote the following language from Thornton on Lost Wills, § 56:

"A will that cannot be found at the death of the testator upon proper search made is presumed to have been destroyed by him *animo revocandi*. This is particularly true where it is traced to the testator's possession and never traced out of it. The law presumes that the will was in his possession and so continued until he destroyed it. But whether or not the will is

in his possession, the presumption of revocation prevails, with the distinction that stronger evidence to overthrow or rebut it is required in the case of possession than in a case where it is traced out of his possession"—citing a great many cases.

It is urged by appellant that it is not sufficient to show that persons interested to establish intestacy had an opportunity to destroy the will; that proponents must go further and show by facts and circumstances that the will was actually fraudulently or accidentally lost or destroyed and against and not in accordance with the wishes and intentions of the testator; that there must always be some suspicious facts in addition to the presence of motive and opportunity to justify a finding that the will had been unlawfully destroyed. The rule is stated in Rood on Wills, at section 357, as follows:

"The presumption of revocation from failure to find the will, or from finding it mutilated, is never conclusive and exists only in the absence of evidence to the contrary. All the circumstances of the case may overcome it, though there may not be any one circumstance sufficient in itself to do so. It may be disproved in most States by showing inconsistent declarations of the testator, though not part of the *res gestæ;* and it may be confirmed by showing other declarations indicating that the will was revoked"—citing *Lawyer* v. *Smith,* 8 Mich. 411 (77 Am. Dec. 460), and *Harring* v. *Allen,* 25 Mich. 505. * * *
"It has been held that the presumption of revocation from not finding the will or from finding it mutilated is not overcome by proof that persons injuriously affected by it had opportunities to destroy or mutilate it. But that would seem to be a matter that should be left to the jury to determine. Certainly the presence of motive cannot be entirely ignored and may suffice with a few other suspicious facts to justify a finding that the will had been unlawfully destroyed."

Whether or not the presumption of revocation is

rebutted is a question for the jury. Thornton on Lost Wills, § 73, citing cases.

The rule seems to be well stated by the supreme court of Wisconsin in *Gavitt* v. *Moulton,* 119 Wis. 35, at page 49 (96 N. W. 395), where Chief Justice Cassoday uses the following language:

"True, the mere fact that the contestant had an opportunity to destroy the will would not of itself overcome the presumption that it was destroyed by the testator with the intent to revoke it; still it is a circumstance to be considered with other proof. Thus it is stated by a standard text-writer that:

" 'If a will last traced to the testator's custody cannot be found at his death, the presumption that he destroyed it for the purpose of revocation outweighs the probability of its fraudulent and criminal destruction by another when unsupported by any evidence except that of opportunity, though this latter circumstance is always worthy of consideration with other proof.' Schouler on Wills (3d Ed.), § 402."

*Cheever* v. *North,* 106 Mich. 390 (64 N. W. 455, 37 L. R. A. 561, 58 Am. St. Rep. 499) ; *Ewing* v. *McIntyre,* 141 Mich. 506 (104 N. W. 787) ; *In re McIntyre's Estate,* 160 Mich. 117 (125 N. W. 51). Many cases might be cited from other jurisdictions.

A careful examination of this record satisfies us that the court did not err in refusing to direct a verdict in the case, and that there was no error in permitting the case to go to the jury. We are of opinion that there was evidence in the record which, if believed by the jury, warranted them in finding that the alleged will of August 19, 1910, was duly executed by the testator, and that he was mentally competent to execute the same, and that the same was executed without undue influence. We think that it became a question of fact for the jury.

Their finding upon this subject established the will in the first instance. And their answers to the special questions by contestant are binding upon her. *Druck* v. *Lime Co., ante,* 364 (143 N. W. 59-62).

2. We have endeavored to read this record with care, and we are unable to find any evidence of undue influence exercised upon decedent by Anna Janke or her husband' after decedent's return to the Janke home from St. Mary's Hospital. There is evidence in the case that Mr. Foerster was not satisfied with this will before he left the hospital, and that he gave instructions to Mr. Kaufmann to prepare a codicil. It is consistent with this record to say that Mr. Foerster became somewhat dissatisfied with conditions at the hospital and wished to return to the home of his sister; that he did return there of his own volition; that he sent for Mr. Kaufmann, the custodian of his will and his attorney under the power given him; that he demanded that these papers be delivered back to him; that they were so delivered to him while in his right mind; and from that time on there is no evidence that he did not do with the papers what he saw fit and uninfluenced. Not being satisfied with the alleged will as drafted, it was not unnatural for him to destroy the paper, intending to leave matters in the condition in which they were before the will was executed. His subsequent statements, made after his return home, to witnesses Jacob Squire, Ludwig Schultz, Christie Meiers, and Christine Meiers are consistent, and only consistent with the revocation of the last will. That these statements made by him were competent evidence appears to be settled by authority. *Lawyer* v. *Smith, supra; Harring* v. *Allen, supra.* See, also, opinion of Chancellor Walworth in *Betts* v. *Jackson,* 6 Wend. (N. Y.) 173.

If we were therefore to eliminate the testimony of Anna Janke and her husband as to the destruction of the will, we have left the fact that the will was traced to decedent; its nonproduction after his death, with the presumption of revocation; and the undisputed evidence that he was dissatisfied with some parts of the will, and his subsequent statements in support of

revocation. There was no evidence that either Anna Janke or her husband ever knew the contents of the will. We think that contestant's third request to charge should have been given. We find that not only was it not given but that the substance thereof was not given to the jury.

3. Was the verdict clearly against the great weight of the evidence? If, as we have found, the jury were warranted in saying that the evidence was sufficient to establish the will in the first instance, of which we have no doubt, and if we are correct in saying that there was no evidence of any undue influence exercised upon decedent by his sister, the contestant, after his return home from St. Mary's Hospital, should it not be held that the verdict upholding the will is clearly against the great weight of the evidence? We have looked in vain for any evidence showing any undue influence exercised by the contestant or her husband over or upon the decedent after his return from the hospital. He seems to have been given every liberty and opportunity to see his friends, and he was visited by two of the beneficiaries under the will, Ernest Krause and John C. Hecker. There is no claim that they did not have free access to him and the opportunity to talk with him untrammeled. It appears that he did not mention the will to either of them after his return home. The subject seems to have been dropped by him, and his conduct was consistent only with the theory of a revocation.

The point that the verdict was contrary to the weight of the evidence was raised in a motion for a new trial. The circuit judge gave his reasons for denying the motion in writing, in which he said that in his opinion the verdict of the jury was not against the weight of the evidence. He laid stress upon the fact that, notwithstanding the testimony of Anna Janke, the contestant, and her husband, that the will made at the hospital was subsequently torn in pieces

and put into the fire by the deceased, it was likewise true that it was claimed by the proponents and established as a fact that both of these witnesses had not only an opportunity to destroy such will but an interest in so doing. The theory of the charge seems to have been that the will was destroyed.

The third special question proposed by the contestant Gustave Foerster should not have been submitted to the jury. It was a double question and could not be answered unequivocally and intelligently. The question we have already quoted, but, being brief, we will here repeat it: "Did said August Foerster tear or burn said will on August 25th, intending to revoke the same?" It was answered "No." This answer is consistent with the idea that, although August Foerster did tear or burn the will on August 25th, he did not do so intending to revoke the same. If he did tear or burn the will on August 25th he would naturally intend thereby to revoke the same, unless the acts were done either by mistake, by undue influence, or when not in his right mind; and there is no evidence to support either of such positions. A review of the evidence of the conduct of the parties subsequent to the making of the will of August 19, 1910, satisfies us that there was an entire lack of evidence necessary to overcome the presumption of revocation by the nonproduction of the will. We think it is our duty in such a case, where the question is raised as it was here by a proper assignment of error after the denial of a motion for a new trial, to set aside the verdict. For authority to do so we need only refer to the case of *In re McIntyre's Estate, supra*. We are of the opinion that the verdict was clearly against the great weight of the evidence.

It was claimed upon the argument that there was fraud on the part of the contestant in that after the death of August Foerster she made two petitions to the probate court for the appointment of a special ad-

ministrator of his estate in which she stated that he left no will, and that she was the only heir. It will be observed that the last will contained a clause revoking all former wills. She was probably wiser than she knew when she said he died without a will, for if the last will was ever made, which the jury found was the fact, it revoked the former will, and when the last will was destroyed the deceased might well be said to have died intestate. Her excuse for this conduct was that she did not know that the paper of June 18, 1910, was a will. She is a German woman and does not read English and testified through an interpreter, and she says that she signed the petitions as they were prepared by her attorney, without knowing their contents. Referring to her statement that she was the only heir, she claimed that she supposed her brothers and sisters in the old country were dead; that she had written to them and had received no reply, and after so many years had elapsed she supposed them dead. Here again she says she signed the papers as prepared by her attorney. Whether these excuses were sufficient or not, the mere fact that she made the petitions and afterwards made another one praying for the admitting to probate of the will of June 18, 1910, such conduct contains no evidence of any undue influence exercised by her upon the decedent after he left the hospital.

We have not overlooked the other assignments of error but are of opinion that they are without merit.

For the errors pointed out the judgment of the circuit court is reversed, and a new trial granted.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.